**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 20 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

THOMAS R. LAWRENCE,

Defendant-Appellant.

No. 02-1259

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 99-CR-207-S)**

---

David C. Japha (Thomas R. Lawrence, Springfield, Missouri, on the briefs), The
Law Offices of David C. Japha, P.C., Denver, Colorado, for Defendant-Appellant.

James C. Murphy, Assistant United States Attorney, (John W. Suthers, United
States Attorney, Kathleen Tafoya, Assistant United States Attorney, Michael
Theis, Assistant United States Attorney, with him on the brief), Denver, Colorado,
for Plaintiff-Appellee.

---

Before **MURPHY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I. INTRODUCTION

Defendant Thomas R. Lawrence was indicted by a federal grand jury for carrying out a scheme to defraud Medicare. Lawrence, a chiropractor, ran a clinic in Denver, Colorado which performed chelation therapy[1] on patients eligible for Medicare. Although chelation therapy is generally not covered by Medicare, Lawrence submitted bills to Medicare indicating the clinic had performed a form of intravenous therapy which was covered by Medicare.

After a four-week jury trial, Lawrence was convicted of four counts of wire fraud in violation of 18 U.S.C. § 1343; fourteen counts of mail fraud, in violation of 18 U.S.C. § 1341; five counts of submitting false claims against the United States in violation of 18 U.S.C. § 287; and thirteen counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Lawrence appeals arguing that: (1) the district court should not have refused to use several instructions he proposed; (2) there was insufficient evidence to support his convictions; (3) the district court erred in denying his motion for a judgment of acquittal because the claims made to Medicare were unpayable on their face; (4) the district court erred in refusing to admit certain evidence; and (5) the district court abused its discretion in denying his motions for a mistrial based on juror misconduct. In supplemental

---

[1] Chelation therapy involves the intravenous infusion of a substance which binds with metals or minerals to remove them from the body. *See* http://nccam.nih.gov/news/2002/chelation/q-and-a.htm#3 (October 9, 2003).

briefing, Lawrence also argues that his sentence is unconstitutional under *Blakely v. Washington*, 124 S. Ct. 2531 (2004). This court has jurisdiction pursuant to 28 U.S.C. § 1291 and **affirms** Lawrence's conviction and sentence for the reasons set out below.

## II.  BACKGROUND

In 1996, the Office of the Inspector General ("OIG") for the United States Department of Health and Human Services began an investigation into the activities of a clinic in Denver based on a referral from the Board of Medical Examiners for the State of Colorado. OIG discovered that billings for medical services were being made to Medicare from the clinic using the provider identification number of a Dr. Lauren Mitchell. At that time, Mitchell was between eighty-one and eighty-two years old and did not live in Denver. OIG monitored the clinic and determined that over a five month period Dr. Mitchell was only at the clinic on Wednesdays for part of the day.

OIG recruited the assistance of a Medicare eligible cooperating witness, Ed Sullivan. Sullivan made an appointment, visited the clinic, and was seen by Lawrence. After listening to Sullivan's complaints of fatigue, Lawrence advised Sullivan that he likely had some heavy metals in his body and should consider chelation therapy. Sullivan refused chelation therapy, but did provide a number of laboratory samples requested by Lawrence. Sullivan made eight visits to the

clinic and each time recorded his interactions for the investigating agents. During each visit, Sullivan asked about Dr. Mitchell, but never saw him and was told that Mitchell only came in occasionally.

At trial, employees of the clinic observed that Dr. Mitchell did not appear to be actively involved in supervising the clinic, but that he would sign off on notes and charts of the patients. Other testimony indicated that Lawrence administered chelation therapy without any supervision from Dr. Mitchell. Medicare requires that a licensed physician directly supervise chelation therapy. Dr. Mitchell broke his hip in February 1996 and was in generally poor health until his death in November 1997. Lawrence continued to submit bills to Medicare under Dr. Mitchell's provider number during this period.

Medicare billing procedures require healthcare providers to use designated numeric codes to describe the services performed. These codes correspond to various therapies and diagnoses. Medicare does not cover all of the services described by the codes. Workers at the clinic testified that Lawrence instructed them to bill Medicare under the therapy codes for a certain intravenous treatment when billing for the chelation therapy services provided at the clinic. The codes to be used, 90780 or 90781, corresponded to a treatment that is covered by Medicare. Chelation therapy, properly coded as MO300, is not ordinarily covered. Several witnesses testified that they confronted Lawrence about using

-4-

the incorrect code, but he continued the practice. Others testified that Lawrence instructed them to describe the services at the clinic as intravenous ("IV") therapy not chelation therapy should they be contacted by an insurance carrier. Employees were also instructed to go through old charts and re-bill the insurance company using the intravenous therapy codes.

Medicare regulations require that billing for medical services be submitted under the provider identification number of the health services provider rendering the services or directly supervising those who do. All of the billing used Dr. Mitchell's provider number and signature stamp. At all times relevant to this case, Dr. Mitchell lacked a valid provider number because his medical license had been revoked in Arizona.

During trial, the district court informed the parties that courtroom personnel had overheard a conversation in which one juror indicated she had already made up her mind. Specifically, one of the deputy clerks overheard a statement to the effect: "I have already made up my mind, I don't know what the other side could say [to change it.]" The other deputy clerk reported hearing an exchange similar to the following:

Juror A: "Who do you think is going to be the holdout?"

Juror B: "It's going to be me."

Juror A: "You are going to look funny with a black eye."

In response to these reports, the district court took testimony from the four jurors involved and the two deputy clerks who overheard the conversation. One of the jurors recalled hearing a statement by another juror that she had made up her mind. The district court specifically asked the juror who allegedly made the statement if she had made the statement or a similar one. The juror twice denied that she had, and the district court reminded her that she was to withhold judgment until hearing all the evidence. The juror affirmed her ability to "be totally fair to both sides" and to make a decision only after all the evidence had been presented.

All of the jurors involved remembered an exchange similar to the one noted above regarding the "hold out," but described the comments as being made entirely in jest. The deputy clerk agreed that the exchange seemed to be a joke. The jurors described the general atmosphere of their conversation as joking. Counsel for defense moved for a mistrial, or in the alternative for the dismissal of the juror who allegedly indicated she had made up her mind. The district court denied the motion, but gave a detailed curative instruction.

Lawrence made a second motion for a mistrial after the defendant's brother, Steven Lawrence, alleged that he had heard a juror state, "I hate chiropractors anyway." The defendant's brother indicated that he heard the comment as two jurors were in a hallway being escorted past the witness room where he was

sitting. The court interviewed courtroom personnel and Steven Lawrence, and determined that the jurors could not have been in that particular hallway at the time alleged. The motion for a mistrial was denied.

Lawrence made a third motion for a mistrial after a pamphlet about jury nullification was found in the jury room. The court interviewed each of the jurors in the presence of counsel allowing the attorneys to ask questions if they so desired.

While several of the jurors indicated they had seen the pamphlet, the court determined that there was, at most, very limited discussion of the contents. The jurors who had seen it, by and large, regarded the pamphlet as a form of "junk mail." All of the jurors who reviewed the pamphlet stated that they would not be influenced by it in their deliberations. The court concluded that there was no indication the pamphlet had affected the jury's ability to follow the instructions or decide the case. The court denied the motion for a mistrial and gave the jury a curative instruction. Following the verdict, Lawrence renewed his arguments concerning juror misconduct in a motion for a new trial. The court denied that motion as well.

Lawrence was sentenced to sixty months' imprisonment on the fraud convictions and seventy-two months' imprisonment on the money laundering convictions. The sentences were imposed to run concurrently.

## III. DISCUSSION

### A. Jury Instructions

Lawrence asserts that the court should have given a proposed instruction explaining that the Medicare Carriers Manual ("MCM") was not binding on providers.[2] The Medicare Carriers Manual contains the procedures to be used for processing claims, as well as information on the codes to be used in that process. Lawrence argues that this instruction was important because it would have demonstrated that the Medicare administration violated its own regulations by failing to issue written corrective instructions to Lawrence regarding his coding practices, failing to perform on-site educational visits, and failing to deny the claims he made after reviewing the documentation he submitted.

Lawrence objected to the district court's refusal to give this instruction below and, therefore, we review the instruction *de novo*. *United States v. Fabiano*, 169 F.3d 1299, 1302 (10th Cir. 1999). "In reviewing jury instructions for error, we review the instructions as a whole to determine whether the jury may have been misled, upholding the judgment in absence of substantial doubt that the

---

[2] The proposed instruction stated, "Ladies and Gentlemen of the jury, you have just heard the testimony regarding the contents of the Medicare Carriers Manual. The MCM is binding on the Medicare carrier alone, therefore, you are instructed to consider that evidence only as it applies to the Medicare carrier in this case. The MCM is not binding on providers."

jury was fairly guided." *United States v. Magleby*, 241 F.3d 1306, 1309-10 (10th Cir. 2001) (quotation omitted).

We conclude that the district court did not err by rejecting the instruction proposed by Lawrence. Lawrence was charged with wire fraud, submitting false claims, and money laundering. While evidence concerning the information contained in the Medicare Carriers Manual may be relevant to these charges, an instruction concerning the applicability of the regulations contained in the manual is not. The government was required to show, and did show, that Lawrence violated the statutes listed in the indictment, not the provisions of the MCM. The instruction requested by Lawrence therefore was, at best, irrelevant to the issues in the case. At worst, the proposed instruction may have caused confusion to the jury. Accordingly, the district court did not err in refusing to give the instruction.

Lawrence also claims that the district court erred in failing to give six other instructions he claims were offered at trial. The record contains no indication that the defendant objected to the district court's rejection of these instructions.[3] Lawrence claims that the district court prevented counsel from making the

---

[3] The government argues that these instructions were never submitted to the court. It is unclear from the record whether Lawrence submitted all of the instructions at issue. The record, however, suggests that the parties did submit a number of instructions to the district court. We assume for the sake of argument, therefore, that Lawrence submitted the instructions we discuss here.

objections by holding argument concerning the instructions off the record and by warning counsel not to raise any objections on the record.

Nothing suggests that the district court took such actions. The district court offered to hear the argument concerning the instructions on the record if counsel so desired. The record reflects that defense counsel agreed to hold the discussion off the record. After the completion of the off-record discussion, the district court allowed both parties to register objections concerning the jury instructions on the record. Defense counsel made a number of objections concerning jury instructions offered by the prosecution and registered the objection concerning the MCM instruction. Moreover, both counsel were offered a second opportunity to raise objections to the instructions prior to closing argument. Defense counsel did not raise any other objections at that time. Thus, it appears that counsel had repeated opportunities to object to the district court's rejection of the proposed instructions and did not do so.

Merely tendering jury instructions, without any further objection, is insufficient to preserve issues related to those jury instructions. *Fabiano*, 169 F.3d at 1303 (10th Cir. 1999). Accordingly, we review for plain error. *Id.* Under plain error review, the defendant must show: (1) an error, (2) that is plain, and (3) which affects substantial rights. *Id.* If those three requirements are met, the court

-10-

"may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. (quotation omitted).

Five of the instructions at issue inform the jury that the government is required to prove beyond a reasonable doubt that there is no reasonable interpretation of the applicable regulations and relevant claims submitted by Lawrence that would make the defendant's statements to Medicare factually correct.[4]  Lawrence relies on *United States v. Migliaccio*, 34 F.3d 1517 (10th Cir. 1994).  In *Migliaccio*, two doctors were convicted of mail fraud after they sought reimbursement for certain procedures.  *Id.* at 1520.  The government alleged the doctors had purposefully used incorrect terminology to describe procedures so that they would be reimbursed.  *Id.*  This court held that in the case of mail fraud: "the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct."  *Id*. at 1525.  We reversed the conviction because the district court failed to instruct the jury concerning the

---

[4]We will not reproduce the instructions in their entirety because they contain a large amount of information not directly relevant to our decision. Lawrence's claim is focused on the following language, which appears in four of the instructions in a virtually identical fashion: "If you find ambiguity, unclarity [sic], confusion, or contradiction exists, then to prove the defendant knew that statements to Medicare were false, the government must prove beyond a reasonable doubt that there is no reasonable interpretation of the situation that would make the defendant's statements factually correct."  The fifth instruction does not use similar language, but addresses intent and instructs the jury that they may "find that ambiguity exists in Medicare reporting requirements . . . ."

defendant's theory that his interpretation of the relevant regulations was reasonable and therefore he lacked the intent to make a false statement. *Id.*

As *Migliaccio* makes clear, such an instruction is only necessary where there is evidence supporting the defendant's interpretation as reasonable. *Id.* ("[W]here the evidence supports a defendant's position, the jury must be instructed concerning reasonable interpretations of ambiguous requirements and the government's ensuing burden."). Under Lawrence's interpretation of the requirements, billing for chelation therapy as intravenous therapy was proper and performing services with only nominal supervision from Dr. Mitchell allowed the use of Dr. Mitchell's provider number for billing purposes. Whether or not those interpretations were reasonable in the first instance, Lawrence was repeatedly alerted to the unreasonableness of his interpretations. Testimony at trial from three different witnesses attested to the fact that Lawrence was confronted concerning his use of intravenous therapy codes to bill for chelation therapy. Joie Durham, the billing consultant hired by the clinic, became concerned about the use of the IV therapy codes and contacted Medicare for clarification. Ms. Durham informed Lawrence that Medicare had stated that billing for chelation therapy using the IV therapy codes was improper and told Lawrence about the

relevant Medicare regulations. Lawrence continued the practice despite this authoritative information.[5]

Lawrence was also repeatedly informed that his use of Dr. Mitchell's provider number was inappropriate because Dr. Mitchell was required to actually supervise the provision of chelation therapy. Lawrence's own expert acknowledged that Medicare's billing regulations require intravenous therapy to be performed under the direct supervision of a doctor. In contrast, although Lawrence offered evidence that written procedures at the clinic called for supervision by Dr. Mitchell, there was no evidence that Dr. Mitchell actually had a sufficient level of involvement to justify the constant use of his provider number. A number of witnesses established that Dr. Mitchell was only infrequently at the clinic, that chelation therapy was performed without his supervision, and that his general physical condition made active supervision of the clinic unlikely. There was, therefore, no evidence to support the defendant's theory that he was relying on his own reasonable interpretation of the regulations and lacked the intent to

_____

[5]To the extent that Lawrence argues he received information from Medicare supporting his interpretation of the regulations and, therefore, his reliance on that information from Medicare was reasonable, there can be no claim that the jury was not instructed regarding this theory. The district court gave a detailed instruction concerning this theory of the defense: "Lawrence contends . . . that he is not guilty because Medicare represented to him that chelation therapy for treatment of heavy metal toxicity was covered, and that using IV codes was acceptable, and that he reasonably relied on that advice by continuing to bill in [that] manner."

-13-

deceive Medicare. In addition, the language of the proposed instructions contained characterizations of the evidence and tangential information regarding Medicare regulations.[6] Accordingly, the district court did not commit plain error by refusing to give Lawrence's instructions related to intent.

Lawrence also proposed but did not object to the omission of a jury instruction regarding the definition of materiality. The district court instructed the jury that the use of a material falsehood was an element of the mail and wire fraud charges. The district court properly stated that a statement is material if "it has a natural tendency to influence, or is capable of influencing a decision or action by another." Lawrence's proposed instruction adds nothing to this definition. The proposed instruction simply states Lawrence's argument that his representations were not material because the claims should not have been paid due to the invalidity of Dr. Mitchell's provider number. Given that the district court's instruction on materiality supplied an accurate definition of the term, the district court did not commit plain error by refusing to give the instruction proposed by Lawrence.

---

[6]For instance, one instruction stated that prosecution witnesses "testified in contradiction to one another regarding Medicare reporting requirements. . . ." Another instruction contains such information as, "[t]he Medicare regulations and Medicare Carrier Manual state that providers may charge patients for services determined to be non-covered. Medicare occasionally prefers a different procedure code be reported than required by Medicare supplemental insurers."

Lawrence also argues that the district court erred in failing to instruct the jury that materiality was an element of the false claim charges under 18 U.S.C. § 287. While there is some disagreement over whether materiality is required under 18 U.S.C. § 287, the law of this circuit currently states that materiality is not an element. *United States v. Parsons*, 967 F.2d 452, 455 (10th Cir. 1992). Accordingly, it was not plain error for the district court to refuse to include materiality among the elements of a charge under 18 U.S.C. § 287.

Lawrence also argues that the district court's instruction stating that the government did not need to prove the item sent by mail was itself false or fraudulent contradicted the instruction giving the definition of a material falsehood. Those instructions are not contradictory in any way. The use of a material falsehood is a separate element of a mail fraud charge from the use of the mails to carry out the fraud. *See Neder v. United States*, 527 U.S. 1, 20 n.3, 25 (1999). Thus, the instructions were appropriate.

Lawrence's final contention concerning the jury instructions is that the district court erred by giving the jury the following instruction: "You may infer, but certainly are not required to infer, that a person intends the natural and probable consequence of acts knowingly done or knowingly omitted." Lawrence contends that *Mann v. United States*, 319 F.2d 404 (5th Cir. 1963), suggests that such an instruction impermissibly shifts the burden of proof. Lawrence is

incorrect. The court in *Mann* stated that "[i]f the charge had ended when the jury was told that a person is presumed to intend the natural consequences of his own acts, when considered in the light of the charge as a whole, there would have been no error." *Id*. at 409. It was the additional statement "unless the contrary appears from the evidence," which shifted the burden of proof from the prosecution to the defendant. *Id.* Nothing in the instructions given by the district court in this case could have had a similar effect. Accordingly, there was no plain error in the district court's instruction regarding the allowable inference of intent.

## B. Sufficiency of the Evidence

Lawrence argues that the district court erred by denying his motion for a judgment of acquittal on all counts because the medical terminology and Medicare regulations were so ambiguous that there was a reasonable doubt as to his intent. We review the record *de novo* to determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt, taking the evidence together with the reasonable inferences drawn from it in the light most favorable to the government. *United States v. Beers*, 189 F.3d 1297, 1301 (10th Cir. 1999).

The wire and mail fraud charges require that the jury find that Lawrence acted with intent to defraud or intent to deceive. At trial, there was evidence that Lawrence instructed employees to inform insurance companies that the clinic performed IV therapy, not chelation therapy. As noted above, Lawrence was

informed that he was using the incorrect code and he refused to alter his behavior. Moreover, other evidence showed that for a period of time Lawrence had utilized the proper codes and did not receive reimbursement. Likewise, there was evidence that Lawrence knew he was improperly using Dr. Mitchell's provider number on the forms submitted to Medicare. Accordingly, there was sufficient evidence of Lawrence's intent to defraud.

The false claim charges require that the jury find Lawrence knew that the claims he submitted were false. Lawrence was aware that none of the laboratory tests reported in the false claims was performed under the direct supervision of Dr. Mitchell, as is required. None of the tests were even performed at the clinic as required for reimbursement. Accordingly, we conclude that the evidence of Lawrence's intent to defraud was sufficient to sustain the conviction.

Lawrence also argues that the evidence was insufficient to support a conviction on the money laundering charges.[7] Lawrence asserts that the government only showed he used the money he received from Medicare to pay ordinary business costs. Thus, according to Lawrence, the government failed to show "the intent to promote the carrying on of specified unlawful activity . . . ."

---

[7] The government asserts that Lawrence failed to raise this argument below and therefore we should review it for plain error. As the government notes, however, reviewing for the sufficiency of the evidence and plain error review usually involve substantially the same inquiry. *United States v. Kimler*, 335 F.3d 1132, 1141 n.10 (10th Cir. 2003). To the extent that the standards differ, we would reach the same conclusion under either standard.

18 U.S.C. § 1956(a)(1)(A)(i). Lawrence concedes that he deposited the money in a bank account and used that money to operate his business, including paying Dr. Mitchell and paying rent. Dr. Mitchell's assistance was essential to the claims submitted by Lawrence. Likewise, keeping the doors of the clinic open assisted Lawrence in carrying out his fraudulent scheme. Using proceeds from the fraudulent scheme in this manner is sufficient to show an intent to carry on the fraud for the purposes of the money laundering charges at issue here. *See United States v. Johnson*, 971 F.2d 562, 566 (10th Cir. 1992).

## C.    Materiality

Lawrence also argues that the district court erred by denying his motion for a judgment of acquittal on the grounds that none of the requests for reimbursement should have been paid by Medicare because the relevant forms all carried Dr. Mitchell's invalid provider number. Therefore, he argues the representations he made on the forms were not material. The denial of a motion for a judgment of acquittal is reviewed *de novo*, viewing the evidence in the light most favorable to the government. *United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003).

To determine whether a statement is material the appropriate test is to examine whether it has a natural tendency to influence, or is capable of influencing a decision or action by another. *United States v. Wiles*, 106 F.3d 1516, 1519 (10th Cir. 1997). The question of whether a statement is material is a question of fact for the jury to decide. *Neder*, 527 U.S. at 19-23.

-18-

Prosecution witnesses testified that Lawrence's use of Dr. Mitchell's provider number was a necessary prerequisite to payment for chelation therapy under the Medicare regulations. Lawrence argues that the claims were unpayable on their face because Dr. Mitchell's medical license had been revoked in Arizona, rendering his Medicare provider identification number invalid. Lawrence suggests that Medicare simply failed to do its job. The evidence showed, however, that information concerning a provider's license in other jurisdictions was not readily accessible in Colorado at the time Lawrence submitted his claims. The invalidation of Dr. Mitchell's provider number was noted in a Medicare sanctions bulletin which listed nearly 4,000 other persons who had been sanctioned. In addition, Dr. Mitchell's name was not listed with a Colorado address, but instead appeared with an Arizona address. Moreover, Dr. Mitchell used a different provider number in Colorado than he did in Arizona. The use of a seemingly valid provider number clearly would have a natural tendency to influence. Likewise, the use of codes corresponding to services covered by Medicare would also have a natural tendency to induce payment. Accordingly, we conclude there was sufficient evidence to sustain the jury's conclusion that misrepresentations made by Lawrence to Medicare were material.[8]

---

[8] Lawrence also argues that the forms submitted to Medicare were not factual statements and therefore cannot be misrepresentations. Lawrence relies on *United States v. Cronic*, 900 F.2d 1511, 1515 (10th Cir. 1990), in which we concluded that a defendant could not be guilty of making a false statement based

**D.     Evidentiary Rulings**

Lawrence claims that the district court abused its discretion by barring the admission of statements made by the late Dr. Mitchell to the FBI and by refusing to admit Government Exhibit 271.  We review evidentiary rulings for an abuse of discretion.  *United States v. Chatman*, 994 F.2d 1510, 1515 (10th Cir. 1993).

**(1)     Statements by Dr. Mitchell**

During trial, Lawrence sought to admit hearsay statements made by Dr. Mitchell to FBI agents.[9]   In his proffer, Lawrence summarized the statements he intended to elicit from FBI agents as follows: Dr. Mitchell told agents that he was the medical director of the clinic and approved all procedures and protocols, that he traveled to the clinic one day a week, and that he believed he was not legally required to be at the clinic to oversee the medical work.  Defense counsel admitted that the statements were hearsay and that no exception to the hearsay rule applied,

---

on passing bad checks because a check was not a statement. The forms submitted by Lawrence seeking reimbursement contain factual assertions about the identity of the health care provider and the services rendered.  Moreover, the person submitting the forms is required to certify that the information as submitted is accurate.  For those reasons, the forms used by Lawrence to claim reimbursement do not resemble checks in any way and *Cronic* has no application to this case.

[9] On appeal, Lawrence cites Federal Rules of Evidence 607, 804(a)(4), 804(b)(3), 804(b)(5), 806(5), 806(6), 806(7), 806(25), and 807 as providing a basis for the admission of the statements.  Lawrence offers no development of that argument in regard to Rules 804(a)(4), 804(b)(3), and 806(5), 806(6), 806(7), and 806(25).  Given Lawrence's failure to provide any guidance as to the substance of his argument regarding these rules, we deem the argument waived. *Shaw v. United States*, 213 F.3d 545, 549 n.6 (10th Cir. 2000).

but urged the court to admit the evidence for impeachment purposes. The government objected to the admission of the evidence.

After hearing argument from counsel, the district court refused to admit the evidence, concluding that it would not have the effect of impeaching a witness, but rather went to issues surrounding the operation of the clinic. The district court went on to examine whether statements should be allowed under the residual exception to the hearsay rule. The court concluded that the statements lacked sufficient indicia of trustworthiness because at the time he made the statements Dr. Mitchell was facing indictment on federal charges. Although his brief is unclear, it appears that on appeal Lawrence focuses his argument on the district court's ruling regarding the applicability of the residual exception under Rule 807.

Federal Rule of Evidence 807 provides that a statement with guarantees of trustworthiness may be admitted if: (1) it is evidence of a material fact; (2) is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) admission of the statement would serve the purposes of the rules and interests of justice. Fed. R. Evid. 807. This court has previously noted that "an expansive interpretation of the residual exception would threaten to swallow the entirety of the hearsay rule." *United States v. Tome*, 61 F.3d 1446, 1452 (10th Cir. 1995). Accordingly, the rule should only be applied "in extraordinary circumstances where the court is satisfied

that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice." *Id.* (quotations omitted).

The trial court did not abuse its discretion by refusing to admit the statements from Dr. Mitchell because the statements did not have any guarantee of truthworthiness. The statements were taken shortly after the FBI executed a search warrant on the clinic. Dr. Mitchell was a subject of the same investigation which eventually led to the charges against Lawrence. Dr. Mitchell, therefore, had a strong motivation to minimize any evidence of wrongdoing at the time he made the statements. Accordingly, the district court did not abuse its discretion by refusing to admit the statements.[10]

### (2) Exhibit 271

Lawrence argues that the district court abused its discretion by failing to admit the government's exhibit 271. During trial, the government moved for the admission of exhibit 271, but Lawrence objected on hearsay grounds. The court sustained that objection. Defense counsel later moved to admit a single page from the exhibit, but the government objected asserting that the entire exhibit should be admitted. The court allowed the page of the exhibit to be read to the jury, but the

---

[10] Lawrence also raises Rule 607 as a basis of admissibility arguing that these statements could be used as impeachment evidence. Lawrence, however, asserts that the statements are needed to prove his theory of the case. Thus, he does not seek to use the statements for any impeachment purpose. Accordingly, it was not an abuse of discretion for the district court to refuse to admit the statements under Rule 607.

exhibit itself was not put into evidence. Lawrence argues that the exhibit's exclusion prevented him from proving his theory of the case. This could not be correct, however, because the jury heard the evidence contained on the only page Lawrence sought to admit. Even assuming the district court erred by failing to admit the exhibit, such error would have been harmless. The information in the exhibit was before the jury and Lawrence has not demonstrated that his substantial rights could have been affected by the failure to admit the actual page of the exhibit. *See United States v. Anaya,* 117 F.3d 447, 448-49 (10th Cir. 1997) (holding that party asserting error in an evidentiary ruling bears the burden of demonstrating his substantial rights were affected).

### E. Motions for Mistrial based on Juror Misconduct

Lawrence alleges that the district court erred by failing to grant his motions for a mistrial based on three instances of alleged juror misconduct. This court reviews the district court's denial of a motion for a mistrial based upon juror misconduct for an abuse of discretion. *See United States v. McHorse*, 179 F.3d 889, 904 (10th Cir. 1999). In a situation involving juror misconduct, the appropriate test is whether actual bias existed or whether the circumstances compel an imputation of inherent bias to the juror as a matter of law such that the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. *Id*. We will address each of the incidents separately.

### (1) Comments by Jurors

The comments allegedly made by the jurors in the first incident are insufficient to establish any evidence of bias. The juror who allegedly made the statement indicating she had reached a decision reaffirmed her ability to fairly decide the case and to withhold decision until all the evidence had been presented. Moreover, the district court's questioning of the juror was structured as a reminder of the juror's duty. Finally, the alleged statement did not indicate for which party she had decided and thus revealed no bias. *See McHorse*, 179 F.3d at 904.

Nor did the comments by the other jurors concerning "holdout" indicate a disposition towards one party. Instead, those comments suggested that the jurors wanted to reach a prompt conclusion. That impulse is understandable given the lengthy trial in this case. Even were we to assume that the jurors' comments reflected some level of bias, "not every incident [involving bias] requires a new trial. The test is whether . . . the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Id*. (quotation omitted) (alteration in original). We cannot reach that conclusion on these facts. Instead, given the atmosphere of humorous banter that surrounded the comments, the district court's strongly worded cautionary instruction was an appropriate response. Accordingly, the district court did not abuse its discretion by refusing to grant a mistrial based on this incident.

### (2)    Comments in the Hallway

The second incident of alleged juror misconduct was reported by the defendant's brother.  As noted above, the district court determined that the jurors could not have been in the hallway at the time the statement was allegedly made.  Lawrence has not argued that this determination was erroneous and nothing in the record suggests that the district court was incorrect.  Accordingly, the district court did not abuse its discretion by failing to grant a mistrial on the basis of an event that it concluded could not have occurred.

### (3)    Jury Nullification Pamphlet

After the pamphlet was discovered in the jury room, the district court interviewed the jurors regarding the impact of the pamphlet.  Each of the jurors who recalled seeing the pamphlet stated that it did not affect their view of the case.  Moreover, many of the jurors stated that they regarded the pamphlet as a form of junk mail.  Such a description suggests that it would have no influence on their decision.  Thus, there was no indication that the presence of the jury nullification pamphlet prejudiced the jurors against the defendant.  Finally, the district court directly addressed the pamphlet in its instructions to the jury, reminding the jurors that they had taken a pledge to follow the law as the court instructed them.  Given the absence of any evidence regarding juror prejudice, the district court did not abuse its discretion by denying the motion for a mistrial.

### (4)     Brief Deliberations

In his supplemental reply brief, Lawrence argues that jurors continually failed to follow the court's instructions regarding their deliberations. For an indication of disobedience, Lawrence relies on the district court's order denying the motion for a new trial, in which the trial court stated, in response to an argument from Lawrence regarding the brief deliberations, that the jurors may have used their lunch break as additional time for deliberation. Lawrence asserts that this indicates the jurors failed to follow an instruction given by the court which stated:

> We will give you a brief recess at this time until you receive your lunch, then you are to have your lunch. During the lunch don't discuss the case, don't start your deliberations. Just have a pleasant lunch. When you have concluded your lunch, I am going to instruct [the alternate juror] that he will be asked not to participate further in the deliberations, so he will be excused. Once he has left the jury room and been excused, you may then proceed as indicated in the instructions to elect a foreperson as your first duty, and to commence your deliberations.

Thus, Lawrence argues the jurors must have disregarded this instruction and prematurely began deliberations in the case during lunch. The jurors, however, may not have violated the instruction. The alternate juror who was to have lunch with the jury did not do so, he left before lunch. As the last line of the quote above indicates, the jury may have concluded that they were, therefore, permitted to commence their deliberations after the alternate juror left. Thus, there is no

-26-

indication that the jury intentionally violated the district court's order. In any case, whether or not the jury began deliberations during lunch, there is no reason to believe that such an action would have prejudiced Lawrence.

Lawrence also suggests that the short period of deliberations reflects bias against him that was exemplified in the three incidents involving the jury discussed above. Assuming that the length of jury deliberations may be relevant to the question of whether the jury was prejudiced against Lawrence, nothing in this case indicates such a bias.[11] As the district court noted many of the exhibits presented in this case were displayed to the jury during the trial, thus mitigating the need to examine each exhibit. In addition, while there were thirty-six counts against Lawrence, these counts fit into four categories of crimes. Thus, the jury had only to apply four sets of elements to the evidence presented. If the jury did not deliberate during lunch it had approximately two hours and fifteen minutes to reach its verdict.[12] Although there was a large amount of evidence in this case, two hours is not so short a time as to obviate a serious discussion of the issues. We,

---

[11] While the amount of time spent in deliberations might provide some indication of whether the jury reached its conclusion with ease or struggled to agree on a verdict, it seems doubtful that the duration of jury deliberations could ever provide certain guidance on the question of whether jurors were biased against the defendant. But *see Stafford v. Saffle*, 34 F.3d 1557, 1564 (10th Cir. 1994) (noting short length of jury deliberations in examining whether a defendant was prejudiced by ineffective assistance of counsel).

[12] If the jury utilized the lunch hour for deliberations, it would have had a total of four and a half hours for consideration of the case.

therefore, decline to impute any bias on the part of the jury based on this period of deliberations. Accordingly, the district court did not abuse its discretion in refusing to grant a new trial.

F.      *Blakely* and *Booker* Error

After oral argument, this court granted Lawrence's motion for supplemental briefing to address issues raised by the Supreme Court's decision in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). Lawrence argues that *Blakely* requires any enhancements and adjustments to his sentence be found by a jury beyond a reasonable doubt. He specifically contends that his Sixth Amendment right to a jury trial was violated by the district court's findings at sentencing regarding the amount of laundered funds, which raised his base offense level on the money laundering charges from twenty-three to twenty-four. *See* United States Sentencing Guidelines ("U.S.S.G.") § 2S1.1(b)(2)(B) (1995).[13] Lawrence also disputes a six-level increase to his base offense level on the fraud charges pursuant to U.S.S.G. § 2F1.1(b)(1)(G), a two-level increase for more than minimal planning pursuant to § 2F1.1(b)(2)(A), a four-level adjustment for his status as organizer or leader pursuant to § 3B1.1(a), and a two-level adjustment for use of a minor pursuant to § 3B1.4. These enhancements and adjustments raised the offense level

---

[13]Because Lawrence was sentenced under the 1995 version of the United States Sentencing Guidelines, all citations to the Guidelines refer to the 1995 version.

on the fraud charges from six to twenty, and pursuant to § 3D1.4 raised the combined offense level from twenty-four to twenty-six. With an offense level of twenty-six and a criminal history category of two, Lawrence's sentencing range was seventy to eighty-seven months. Absent the court's extra-verdict factual findings, his combined offense level would have been twenty-three and his sentencing range would have been fifty-one to sixty-three months.

In *United States v. Booker*, the Supreme Court applied its opinion in *Blakely* to hold that mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment when judge-found facts other than the fact of prior convictions are employed to enhance a defendant's sentence. 125 S. Ct. 738, 755-56 (2005). Because Lawrence did not raise a challenge to the constitutionality of his sentence before the district court, his argument on appeal is subject to review for plain error. *See United States v. Cotton*, 535 U.S. 625, 629, 631 (2002); *United States v. Gonzalez-Huerta*, No. 04-2045, — F.3d —, 2005 WL 807008, at *3 (10th Cir. Apr. 8, 2005) (en banc). This court has discretion to recognize plain error that was not raised in the district court when (1) there is an error; (2) that is plain; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Cotton*, 535 U.S. at 631-32.

In *United States v. Gonzalez-Huerta*, this court held that sentencing a defendant under the mandatory Guidelines scheme is error that is plain and thus satisfies the first two prongs of the plain-error test. *Gonzalez-Huerta*, 2005 WL

807008, at *3. This court need not answer the question whether a defendant can show prejudice under the third prong of the plain-error test if the defendant cannot also demonstrate that the district court's error seriously affected the fairness, integrity, or public reputation of judicial proceedings (the so-called "fourth prong" of the plain-error test). *See Cotton*, 535 U.S. at 632-33; *Gonzalez-Huerta*, 2005 WL 807008, at *6.

The *Gonzalez-Huerta* court held that the district court's error in that case failed to satisfy the fourth plain-error prong. *Gonzalez-Huerta*, 2005 WL 807008, at *8. In doing so, the court noted that the defendant had not suffered constitutional error at sentencing because the district court had not enhanced the defendant's sentence based on judge-found facts. *Id.* Rather, the only error suffered by the defendant was non-constitutional error resulting from the Supreme Court's remedy in *Booker* of excising the statutory provisions making the Guidelines mandatory. *Id.* The court emphasized that the defendant has the burden of demonstrating that the fourth prong of the plain-error test has been satisfied, and that "sentencing error meets the fourth prong of plain-error review only in those rare cases in which core notions of justice are offended." *Id.* at *7, *9.

Unlike *Gonzalez-Huerta*, this case involves constitutional *Booker* error because Lawrence's sentence of seventy-two months could not have been imposed absent judge-found facts regarding the sentencing enhancements and adjustments. *Id.* at *2. Under *Booker*, however, the district court's error was not merely the

-30-

reliance on judge-found facts to enhance Lawrence's sentence, but rather the reliance on judge-found facts to enhance Lawrence's sentence *mandatorily*. *Booker*, 125 S. Ct. at 750 ("If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment."); *Gonzalez-Huerta*, 2005 WL 807008, at *2; *United States v. Mares*, No. 03-21035, --- F.3d ---, 2005 WL 503715 at *5-6 (5th Cir. Mar. 4, 2005); *United States v. Antonakopoulos*, 399 F.3d 68, 75 (1st Cir. 2005); *United States v. Rodriguez*, 398 F.3d 1291, 1300 (11th Cir. 2005). For this reason, the Supreme Court's holding in *Booker* would not have prohibited the district court from making the same factual findings and applying the same enhancements and adjustments to Lawrence's sentence as long as it did not apply the Guidelines in a mandatory fashion. *Rodriguez*, 398 F.3d at 1300-01.[14] Whether the district court would simply reimpose the same sentence on remand, or whether instead the sentence "would likely change to a significant degree if [the case] were returned to the district court for discretionary resentencing," is one factor to consider in determining whether the defendant can satisfy the fourth plain-error prong. *See Gonzalez-Huerta*, 2005 WL 807008, at *13 (Ebel, J., concurring).

---

[14]In fact, *Booker* obligates district courts to continue to consult the Guidelines when formulating a sentence. *See Gonzalez-Huerta*, 2005 WL 807008, at *8 ("Even though district courts now have discretion in sentencing, they must consider the Guidelines . . . when sentencing.").

There were two points during the sentencing proceeding when counsel made arguments to the district court that the court concluded it could not consider under the mandatory Guidelines system. A district court's statement that it is prohibited from considering mitigating facts presented by the defendant might in some circumstances give rise to the inference that the district court would likely give a lower sentence if the Guidelines were advisory. *See, e.g., United States v. Heldeman*, No. 04-1915, --- F.3d ----, 2005 WL 708397, at *3-4 (1st Cir. Mar. 29, 2005). In the first of these instances, counsel argued that the disparity between the relatively high base offense level on the money laundering counts and the comparatively lower base offense level on the fraud counts warranted a lower sentence. In response, the district judge stated:

> As far as the discrepancy in the two offense levels, you are going to have to talk to the sentencing commission. You are preaching to the wrong congregation here because I don't set guidelines and the guidelines are set . . . .
> I didn't create the disparity, neither did the probation department. The Sentencing Commission did. So that issue is rejected.

In the second incident, counsel made the related argument that the base offense level on the money laundering counts was too high. The following colloquy then occurred:

> THE COURT: I have heard the word Draconian used.
> COUNSEL: Yes, I agreed with you.
> THE COURT: I didn't say I used it. I said I heard it.
> COUNSEL: Yes, your Honor. It's the same offense level if somebody were convicted of dealing 80 kilos of marijuana or –

THE COURT: I have heard the same with use of crack cocaine or cocaine. Again these are guidelines issues. Talk to the Sentencing Commission.

These statements by the district court reveal that the court erroneously felt itself bound by the Guidelines. They do not, however, necessarily evince a desire on the part of the court to give Lawrence a sentence lower than the Guidelines-specified range. Although the court stated that it had "heard the word Draconian used" to describe the sentencing range, it was also careful to state that it was not endorsing that view. *Compare United States v. Trujillo-Terrazas*, No. 04-2075, — F.3d —, 2005 WL 880896, at *1, *5 (10th Cir. Apr. 13, 2005) (finding the fourth prong of the plain-error test satisfied where the sentencing judge imposed a forty-one month sentence after stating "I don't want to send anybody to jail, and I wish that I didn't have to").

It is in any case unnecessary to decide whether the district court's statement standing alone could satisfy the fourth plain-error prong, because other evidence in the record demonstrates that the district court would impose the same sentence even under an advisory Guidelines system. In considering what sentence to impose within the range specified by the Guidelines, district courts may consider, "without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." *See* U.S.S.G. § 1B1.4. Lawrence's counsel argued that the district court should sentence at the bottom of the range because Lawrence's crime was "not as heinous as the government

-33-

attempted to make it." Nothing would have prevented the district court from considering counsel's arguments regarding the relative severity of the money laundering sentence in fashioning a sentence *within* the Guidelines range. *See Gonzalez-Huerta*, 2005 WL 807008, at \*6. Nevertheless, the district court sentenced Lawrence to seventy-two months in prison, two months above the bottom of the range. The court's apparent rejection of defense counsel's arguments that a lower sentence was appropriate strongly indicates that the court felt that there were no mitigating factors that would justify a lower sentence in this case. *See United States v. Infante*, No. 02-50665, --- F.3d ----, 2005 WL 639619, at \*13 (5th Cir. Mar. 21, 2005) (concluding under the third plain-error prong that the defendant had failed to show a reasonable probability that he would have received a lower sentence under an advisory Guidelines system when the district court sentenced him above the bottom of the Guidelines range).

Furthermore, Lawrence argued for downward departures at sentencing on the grounds that the money laundering activity was not complex enough to warrant the high base offense level under the Guidelines, and that the enhancements for amount of loss significantly overstated the seriousness of his offense. Although the district court acknowledged that it possessed discretion to depart downward, it nevertheless denied both motions. The court's refusal to invoke its discretion to depart is further evidence that the court felt that seventy-two months was an appropriate

sentence, and that it would have given the same sentence even under an advisory Guidelines system.

Core notions of justice would not be offended if this court declined to notice a sentencing error that had no effect on Lawrence's sentence. Lawrence therefore cannot demonstrate that the district court's error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *See Gonzalez-Huerta*, 2005 WL 807008, at *13 (Ebel, J., concurring). Because he cannot satisfy the plain-error test, his sentence must be affirmed.[15]

## IV. Pending Motions

---

[15]Lawrence argues for the first time in his second supplemental brief that the district court should have applied the 2001 version of the Guidelines instead of the 1995 version. This court's order granting supplemental briefing, however, did not authorize Lawrence to raise this issue. Absent authorization from this court, a party is generally precluded from raising issues in a supplemental brief that were not addressed in the opening brief. *See United States v. Kimler*, 335 F.3d 1132, 1138 n.6 (10th Cir. 2003).

In contrast to his argument on appeal, Lawrence argued at sentencing that the 1995 Guidelines should be applied because the 2001 Guidelines would have imposed a *higher* sentencing range after application of enhancements and adjustments. He presumably switches positions on appeal in the mistaken belief that the district court post-*Booker* could not constitutionally impose any sentencing enhancements or adjustments absent a finding by a jury beyond a reasonable doubt. As previously discussed, however, district courts after *Booker* can continue to apply Guidelines enhancements and adjustments as long as they do not do so in a mandatory manner. In light of this fact, this court declines to consider Lawrence's argument that the district court erred in applying the 2001 version of the Guidelines.

Lawrence has filed a number of motions, including two motions to file an amended reply brief, a motion to reconsider the denial of Lawrence's request to file a second amended opening brief, and a motion to amend appellant's appendix. With the appointment of counsel for appeal and counsel's submission of a supplemental brief and supplemental reply brief, Lawrence's motions concerning appellate briefing and supplementing the record on appeal have become moot. Accordingly, these motions are dismissed. Lawrence's motion for declaratory and injunctive relief is denied.

## V.     Conclusion

For the reasons set forth above, we **affirm** Lawrence's conviction and sentence.