**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | No. 03-4298 |
| v. | D. Utah |
| SCOTT D. HEMSLEY, also known as Scott Dick Hemsley, also known as Scooter, | (D.C. No. 2:02-CR-87-01-ST) |
| Defendant - Appellant. | |

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **HARTZ**, and **TYMKOVICH**, Circuit Judges.

Scott Hemsley pleaded guilty to manufacture or attempted manufacture of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and possession of a firearm by a restricted person in violation of 18 U.S.C. § 922(g)(3). On December 8, 2003, he was sentenced in accordance with the United States Sentencing Guidelines to 188 months in prison followed by 60 months' supervised release. On appeal Mr. Hemsley contends that (1) the district court

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

erred in adopting a 33% iodine-to-methamphetamine conversion ratio in its drug-quantity calculations, and (2) the district court violated *United States v. Booker*, 543 U.S. 220 (2005), in factfinding that increased his sentence. We have jurisdiction under 18 U.S.C. § 3742(a) to review Mr. Hemsley's sentence. We affirm.

## I.  BACKGROUND

On February 6, 2002, Mr. Hemsley and various friends and family members were named in a six-count indictment charging drug and firearm offences. The charges stemmed from a search of the Hemsley residence by the Salt Lake City Police Department (SLCPD) on December 11, 2001. Among the items found in the search were a fully operable clandestine methamphetamine laboratory in a bedroom closet, numerous pieces of drug paraphernalia located throughout the residence, packaging material and scales, a loaded .40 caliber firearm in a vehicle outside the residence, a loaded Tech 9 firearm in the bedroom closet, and quantities of red phosphorous, pseudoephedrine, methamphetamine, iodine, and marijuana.

The Hemsleys' 12-year-old daughter, who was present at the home, was taken into protective custody by the Division of Child and Family Services after being examined by the Primary Children's Medical Center and medically cleared.

A test conducted on the child's hair showed that she had metabolized amphetamine.

The SLCPD's investigation showed that over the course of several months Mr. Hemsley had purchased, and directed several of the codefendants to purchase, 82 ounces (2,324 grams) of iodine, a precursor to methamphetamine. Mr. Hemsley ultimately pleaded guilty to one count of manufacturing methamphetamine, *see* 21 U.S.C. § 841(a)(1), and one count of possession of a firearm by a restricted person, *see* 18 U.S.C. § 922(g)(3). His offense level under the Sentencing Guidelines was calculated as follows:

| | |
|---|---:|
| Base Offense Level under U.S.S.G. § 2D1.1(c)(2) | 36 |
| Enhancement for possession of a firearm under U.S.S.G. § 2D1.1(b)(1) | +2 |
| Enhancement for creating a substantial risk of harm to the life of a minor under U.S.S.G. § 2D1.1(b)(5)(C) (now U.S.S.G. § 2D1.1(b)(6)(C)) | +6 |
| Enhancement for being the manager or supervisor of the criminal activity under U.S.S.G. § 3B1.1(b). | +3 |
| Reduction for Acceptance of Responsibility under U.S.S.G. § 3E1.1. | -3 |
| Reduction for successful post-offense rehabilitation. | -2 |
| Reduction for providing material assistance to the government under U.S.S.G. § 5K1.1. | -7 |
| *Total Offense Level* | 35 |

The base offense level of 36 was calculated as follows: First, the amounts of relevant chemicals were established: 174.85 grams of pseudoephedrine, 11.9 grams of actual methamphetamine, 4.1 grams of a substance containing methamphetamine, 1.32 grams of marijuana, and 2,324.7 grams of iodine. (The

small amount of marijuana found in the residence was not included in the drug quantity calculations, however, because it was determined to be for personal use.) Second, the quantities of three of the chemicals were converted to their marijuana equivalents using the drug equivalency tables in U.S.S.G. § 2D1.1 application note 10: 174.8 grams of pseudoephedrine equate to 1,748 kilograms of marijuana, 11.9 grams of actual methamphetamine equate to 238 kilograms of marijuana, and 4.1 grams of a substance containing methamphetamine equate to 8.2 kilograms of marijuana. Because iodine is not included in the drug equivalency tables, conversion of the iodine to a marijuana equivalent involved an additional step of first converting it to a methamphetamine equivalent. The 2,324.7 grams of iodine was multiplied by 33% to equal 767.2 grams of actual methamphetamine. The 767.2 grams of methamphetamine was then equated to 15,344 kilograms of marijuana. Third, the marijuana equivalents for the quantities of methamphetamine were added to the marijuana equivalent for the "quantity of the single [precursor] chemical that results in the greatest offense level," U.S.S.G § 2D1.11 App. Note 4(A), in this case, iodine. Mr. Hemsley's total marijuana equivalent was 15,590.2 kilograms, which resulted in a base offense level of 36. *See* § 2D1.1(c)(2).

Based on Mr. Hemsley's criminal history category of II, the district court found the applicable sentencing range to be 188-235 months. Consistent with the

government's recommendation, Mr. Hemsley was sentenced at the bottom of that range. This appeal followed.

## II. IODINE-TO-METHAMPHETAMINE CONVERSION

Mr. Hemsley first argues that the district court erred in its calculation of the applicable quantity of methamphetamine. He argues that there was insufficient evidence, even under a preponderance-of-the-evidence standard, to support the district court's adoption of a 33% factor for converting iodine to methamphetamine. This argument faces a major hurdle, however, because it was not raised in district court.

The 33% conversion ratio first appeared in the presentence report (PSR). The PSR calculated that the 82 ounces (2,324.7 grams) of iodine purchased for the manufacturing operation would produce 767.2 grams (33% x 2,324.7) of methamphetamine. Mr. Hemsley filed a variety of objections to the PSR's drug-quantity calculations, but, contrary to his assertion on appeal, he did not specifically object to the iodine-to-methamphetamine conversion factor. The objection he cites to us was the following:

> 3. Defendant asserts that the iodine be assessed only at the level of methamphetamine which could be produced from the iodine and other precursors located at the Defendant's home, and he asserts that the iodine cannot be used to manufacture methamphetamine independent of other chemicals.

App. Vol. 1 at 98–99. But this objection does not challenge the proposition that the weight of methamphetamine produced using a quantity of iodine is equal to 33% of the weight of the iodine. Rather, it argues that the quantity of methamphetamine to be used in calculating the offense level cannot exceed the amount that could be manufactured with the chemicals found in the residence. In other words, the objection argues that the amount of iodine for sentencing purposes should be capped at the amount that could have been used in methamphetamine production *given the amount of other precursors found at the lab*. We refuse to construe general objections to the drug-quantity calculation as applying to all potential calculations and conversions necessarily involved in that determination.

Furthermore, at Mr. Hemsley's request the district court held an evidentiary hearing on the issue of the drug-quantity calculation, and the appropriate iodine-to-methamphetamine conversion ratio was not challenged at the hearing. After the hearing the district court ordered the Probation Office to provide further information on the calculations related to pseudoephedrine and iodine quantities. The Probation Office responded with a four-page memorandum, which included the foundation for the 33% ratio. Although Mr. Hemsley now attacks that foundation (and the district court's adoption of the ratio in reliance on it) as inadequate, in district court he made no objection to the conversion ratio or the

Probation Office's memorandum. We therefore conclude that Mr. Hemsley failed to object below to the use of the 33% conversion ratio.

Because Mr. Hemsley did not object to the 33% conversion ratio in the district court, our review is only for plain error. *See Jones v. United States*, 527 U.S. 373, 389 (1999). Plain error exists when there is (1) error, (2) that is plain, and (3) that affects substantial rights. *Id.* If all three conditions are met, the court may then exercise its discretion to notice a forfeited, plain error, but only if (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (alteration in original, internal quotation marks omitted).

"This court has held repeatedly that factual disputes not brought to the attention of the [trial] court do not rise to the level of plain error." *United States v. Svacina*, 137 F.3d 1179, 1187 (10th Cir. 1998). In *Svacina* the defendant's appeal raised for the first time an objection that the government had produced no evidence that the methamphetamine he distributed was D-methamphetamine rather than L-methamphetamine (before November 1, 1995, the drug equivalency tables distinguished between D- and L-methamphetamine). *Id.* at 1185-87. We said, "This is precisely the kind of issue that should be raised at sentencing, if not before, so that a record sufficient to permit adequate review is thereby developed." *Id.* at 1187 (internal quotation marks omitted). The same is true

here.  Because of Mr. Hemsley's failure to object, the government was denied notice that the iodine-to-methamphetamine conversion ratio was contested and thus the opportunity to present supporting evidence.  *See id.* ("As a factual issue, an objection is the only means by which a party can give notice that an evidentiary hearing is required or that the government has a burden it has not met.").

Although the district court "may not satisfy its obligation by simply adopting the presentence report," *United States v. Farnsworth*, 92 F.3d 1001, 1011 (10th Cir. 1996), it may "adopt[] the presentence report as relevant and true after an analysis of [its] findings and Defendant's objections thereto." *Svacina*, 137 F.3d at 1183.  In the absence of any objection by the defense, the district court was entitled to find facts in accordance with the Probation Office's representation that the "amounts of iodine were calculated pursuant to information received from the Drug Enforcement Administration (DEA).  The DEA representative noted that an ultra-conservative ratio of converting iodine to methamphetamine (actual) would be 3:1 or .33, given the method used by the defendants to manufacture methamphetamine in the clandestine lab."  App. Vol. 2 at 183.  Accordingly, we hold that there was no plain error justifying reversal with respect to this issue.

## III.  *BOOKER* ERROR

Mr. Hemsley argues that he is entitled to resentencing based on the district court's constitutional error under *United States v. Booker*, 543 U.S. 220 (2005). "A district court commits constitutional *Booker* error when it applies the Guidelines in a mandatory fashion, makes factual findings (other than the fact of prior convictions), and imposes a sentence above the maximum that would apply in the absence of such findings." *United States v. Clark*, 415 F.3d 1234, 1238 (10th Cir. 2005) (internal quotation marks and emphasis omitted). In this case the district court found by a preponderance of the evidence the following facts that increased Mr. Hemsley's offense level: (1) the offense created a substantial risk of harm to a minor child; (2) the quantity of iodine purchased as part of the manufacturing conspiracy could be expected to yield 33% of that quantity of methamphetamine; and (3) Mr. Hemsley was the manager or supervisor of criminal activity involving at least five persons.

When a *Booker* issue is not raised in the district court, we review the sentence only for plain error. *United States v. Dazey*, 403 F.3d 1147, 1174 (10th Cir. 2005). As discussed above, "[p]lain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (internal quotation marks omitted.).

Constitutional *Booker* error satisfies the first two prongs of the plain-error test. *Clark*, 415 F.3d at 1240. The defendant can meet his burden to satisfy the third prong, which requires that the error "affected the outcome of the district court proceedings," *Dazey*, 403 F.3d at 1175 (internal quotation marks omitted), by showing a reasonable probability that the district court would impose a sentence outside the applicable guidelines range if the case were remanded, or by showing a reasonable probability that a jury, applying the beyond-a-reasonable-doubt standard, would not have found the facts necessary to enhance the sentence. *Id.* If the defendant satisfies the third prong, the fourth prong still requires him to show that the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Gonzalez-Huerta*, 403 F.3d at 732 (internal quotation marks omitted). Although we conduct this review less exactingly in cases of constitutional *Booker* error, *see Dazey*, 403 F.3d at 1174, it is still a "demanding standard," *Gonzalez-Huerta*, 403 F.3d at 737.

Here, the government concedes that the district court engaged in fact-finding that amounted to constitutional *Booker* error in Mr. Hemsley's sentence. Therefore, we need only analyze whether Mr. Hemsley has satisfied his burden on the third and fourth prongs of the plain-error inquiry. Because the fourth prong imposes such a high burden, *Booker*-error cases are often resolved on the fourth prong rather than the third. *See United States v. Lawrence*, 405 F.3d 888, 906

(10th Cir. 2005) ("This court need not answer the question whether a defendant can show prejudice under the third prong of the plain-error test if the defendant cannot also demonstrate that the district court's error seriously affected the fairness, integrity, or public reputation of judicial proceedings . . . ."). "[S]entencing error meets the fourth prong of plain-error review only in those rare cases in which core notions of justice are offended." *Id.* (internal quotation marks omitted). Because we conclude that Mr. Hemsley cannot meet this burden, we need not address the third prong.

In *United States v. Bass*, 411 F.3d 1198, 1205 (10th Cir. 2005), we addressed a similar plain-error claim. Mr. Bass was convicted on five counts of knowing possession of child pornography after an investigation found more than 2000 images on his computer. *Id.* at 1200. He was sentenced, however, under the guideline governing offenses involving trafficking in child pornography. *Id.* at 1202. Although he did not object at sentencing to application of the trafficking guideline, we held that the district court had committed plain error and remanded, noting: "Although the PSR asserted, and the district court in turn found, that the offenses at issue involved trafficking in, as opposed to mere possession of, child pornography, neither the PSR nor the district court offered a rationale for the finding, and there is little evidence in the record to support such a finding." *Id.* at 1205. We identified four factors as directing that we should exercise our

discretion under the fourth prong to correct the error in Mr. Bass's sentence. First, we considered that the error was constitutional in nature, because the burden of plain-error review is imposed less rigorously in such cases. *Id.* Second, we considered the "complete lack of record support for the district court's finding." *Id.* Third, we considered that the error increased the defendant's offense level. *Id.* And, finally, we considered "indications . . . that [the district court] might have selected a lower sentence had it had the discretion to do so." *Id.*

We now evaluate these four factors in Mr. Hemsley's case. As in *Bass*, the errors in Mr. Hemsley's sentence are constitutional in nature and increased the offense level for which he was sentenced. Mr. Hemsley's case significantly differs from *Bass*, however, in the application of the other two factors.

In contrast to *Bass*, Mr. Hemsley's sentencing enhancements are not plagued by a "complete lack of record support." *Id.* Mr. Hemsley does not challenge the sufficiency of the evidence with respect to the district court's preponderance-of-the-evidence findings regarding child-endangerment and his role in the offense. As for the iodine-to-methamphetamine conversion ratio, the supplemental information provided by the Probation Office reported that "[t]he DEA representative noted that an ultra-conservative ratio of converting iodine to methamphetamine (actual) would be 3:1 or .33, given the method used by the

defendants to manufacture methamphetamine in the clandestine lab." App. Vol. 2 at 183. Mr. Hemsley did not challenge the conversion ratio below, and we are not inclined to presume that if he had, the DEA would have been unable to support its assertion.

Moreover, we cannot assume, as in *Bass*, that the district court's having sentenced Mr. Hemsley at the bottom of his guideline range suggests that the court would have reduced the sentence still further had it known that under *Booker* it had that discretion. Circumstances here compel the opposite inference. To begin with, the district court expressed satisfaction with the sentence imposed:

> [T]he Court believes that under the totality of the circumstances of this case, in light of what the defendant originally faced if the government had not made its effort to bring Mr. Hemsley more in line with the other defendants by bringing a felony information in place of the indictment, and in light of the argument that [the government] made, that the Court agrees with fully, that were it not for Mr. Hemsley, the other defendants in all likelihood would not be where they are, the Court believes that this sentence . . . of 188 months is consistent relative to culpability of the defendants in this case.

App. Vol. 1 at 172-73. Mr. Hemsley has not pointed us to anything indicating that the court would feel differently upon remand. And, more importantly, the district court actually possessed and exercised discretion to depart from the guidelines in imposing the original sentence. It granted a departure under U.S.S.G. § 5K1.1 because of Mr. Hemsley's assistance to the government. Under § 5K1.1 the court "retains discretion to depart to the degree it finds appropriate,

-13-

regardless of a specific recommendation by the government." *United States v. Ollson*, 413 F.3d 1119, 1121 (10th Cir. 2005). The district court clearly understood the nature of its discretion under § 5K1.1—it granted a seven-level departure although the government had requested only a five-level reduction in its motion for downward departure. Given the district court's exercise of discretion, it would be too speculative to suppose that the court would reduce the sentence further under *Booker*. *See id.* (holding nonconstitutional *Booker* error harmless because the court had acted under § 5K1.1 discretion in the original sentencing).

Accordingly, we hold that affirming Mr. Hemsley's sentence will not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Gonzalez-Huerta*, 403 F.3d at 732 (internal quotation marks omitted). On the record before it the district court is not likely to revisit its sentence, and there is no unfairness in denying Mr. Hemsley a second opportunity to challenge the factual support for the sentencing enhancements.

## IV. CONCLUSION

We AFFIRM the sentence imposed by the district court.

ENTERED FOR THE COURT

Harris L Hartz
Circuit Judge