F I L E D
United States Court of Appeals
Tenth Circuit

MAY 17 2005

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SANDEE D. DOWLIN and
WALTER G. NAYLOR, d/b/a Freship,
Provider Corp., Dos Brisas
Corporation,

Defendants-Appellants.

Nos. 03-8038 and 03-8055

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 02-CR-74-J)

James H. Barrett, Assistant Federal Public Defender, (Michael G. Katz, Federal
Public Defender, with him on the brief) Office of the Federal Public Defender,
Cheyenne, Wyoming (with Ronald G. Pretty, Cheyenne, Wyoming, on
Supplemental Brief as to Application of     *Booker* ) for Defendant-Appellant Sandee
D. Dowlin, and Maynard D. Grant, Grant & Newcomb LLC, Seattle, Washington,
for Defendant-Appellant Walter G. Naylor.

Lisa E. Leschuck, Assistant United States Attorney, (Matthew H. Mead, United
States Attorney, with her on the briefs) Office of the United States Attorney,
Cheyenne, Wyoming, for Plaintiff-Appellee.

Before **MURPHY** , **ANDERSON** , and **TYMKOVICH** , Circuit Judges.

**TYMKOVICH** , Circuit Judge.

A Wyoming jury convicted Walter G. Naylor and Sandee D. Dowlin on numerous federal fraud charges. From the mid-1990's to 2002, the defendants promoted investments in which investors were promised enormous returns (in excess of 6,500%) over a short period of time (90 days) in exchange for relatively small investments.

Specifically, the jury convicted both Naylor and Dowlin of conspiracy to transport in interstate commerce money and securities taken by fraud, wire fraud, securities fraud, and mail fraud, in violation of 18 U.S.C. § 371; securities fraud and aiding and abetting, in violation of 15 U.S.C. §§ 77q(a)(1)–(3) and 77x, and 18 U.S.C. § 2; and wire fraud and aiding and abetting, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2. In addition, the jury convicted Naylor of money laundering, in violation of 18 U.S.C. § 1957(a) and (b)(1); mail fraud, in violation of 18 U.S.C. § 1341; transportation in interstate commerce of money and securities taken by fraud, in violation of 18 U.S.C. § 2314; and an additional count of wire fraud, in violation of 18 U.S.C. § 1343.

On appeal, Naylor asserts a number of trial errors. He argues (1) that the government presented insufficient evidence to convict him on the conspiracy charge. He does not, however, claim there was insufficient evidence to sustain his other convictions. Naylor also claims the district court erred during the

course of the trial by (2) improperly excluding certain state-of-mind evidence, (3) erroneously refusing to grant a continuance of the trial, and (4) giving improper jury instructions.[1]

Dowlin, in turn, argues that the government presented insufficient evidence to support her convictions. She also claims in supplemental briefing that her sentence is improper under *United States v. Booker*, 125 S. Ct. 738 (2005).

We take jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), consolidate the two appeals, and affirm the convictions. We also affirm Dowlin's sentence.

## I. Background

### A. The Investors and Investment Opportunities

At the time of his indictment, Naylor was a sixty-nine year-old resident of Cheyenne, Wyoming. For over 20 years he targeted local area ranchers, farmers, and others for participation in his investment schemes. In exchange for relatively small sums of money, Naylor promised huge returns over a short period of time.

During those years, Naylor promoted several exotic and complex investment "programs" involving large sums of money and vague deliverables. The trial focused on three specific investments: (1) the development of a

---

[1] Naylor withdrew his claim that the district court erred in applying the United States Sentencing Guidelines in light of *Blakely v. Washington*, 124 S. Ct. 2531 (2004) and *United States v. Booker*, 125 S. Ct. 738 (2005).

patented "hyperbaric" storage container that would allow perishable items to be kept fresh for several weeks in transit from farm to market; (2) the redemption or sale of gold certificates that Naylor obtained from a Philippine organization, which were supposedly authentic and worth billions of dollars; and (3) the trade of "high-yield, mid-term" promissory notes.[2]

Naylor's investment solicitations followed a predictable pattern. He found most of the investors through networking in Colorado, Nebraska and Wyoming, and convinced them that he could provide an unprecedented opportunity to realize substantial returns. Investors typically filled out an "application form" and paid a refundable "application fee" or "loan" of $15,000, which Naylor was to use for expenses associated with bringing the projects to fruition. In exchange, Naylor promised $1.0 to 1.5 million, a return of over 6,500%, within months at the time of "funding."

Investors parted with their money in a variety of ways. Some gave Naylor personal checks or cash, while others wired money to one of his or Dowlin's

---

[2] The trial record does little to clarify how these trading programs allegedly worked. One investor stated that Naylor did not provide specifics as to any particular program. A government expert witness testified that legitimate mid or medium term notes are debt obligations issued by banks or bank holding companies that are ordinarily repaid in ten years and issued into the market by brokers or sold privately to large pension funds. Naylor's testimony did not explain how the alleged programs operated other than stating that they "return a tremendous amount of profit rapidly" and "are all offshore."

accounts. One investor permitted Naylor to use the investor's credit card for travel and living expenses, including lodging and food service at luxury hotels around the world. Another investor, an elderly nursing home resident, allowed Naylor to fill out personal checks, which Naylor cashed and used for traveling expenses.

**B. The Gold Certificates**

Naylor's representations as to how he intended to realize the promised exorbitant returns were inconsistent. However, much of the evidence at trial centered on two gold certificates, supposedly worth billions of dollars at "maturity."

*1. The 1,000-metric ton certificate*

The first certificate was purportedly redeemable for 1,000 metric tons of gold (the "1,000-metric ton certificate"). Naylor claimed the International Foundation for Community Development (Philippines), Inc. (the "Foundation") obtained the certificate, valued at approximately $9 billion, from the estate of the late Philippine President Ferdinand Marcos. According to Naylor, the certificate had been issued in 1983 and would mature in 2003, at which time it could be redeemed at the Union Bank of Switzerland ("UBS"). Evidence introduced by Naylor suggested that the Overseas Investment Bank, Ltd. originally issued the certificate, Lincoln Bank and Trust Co. subsequently reissued the certificate after

the Overseas Bank dissolved, and the gold underlying the certificate was deposited at UBS after Lincoln Bank dissolved.[3]

Naylor testified that the Foundation assigned the certificate to him so he could raise funds for a variety of humanitarian projects. According to Naylor, he intended to redeem, sell or draw a line of credit on the certificate and use the resulting billions of dollars to either (1) provide investors with their promised returns, or (2) invest in another trading program, which itself would yield the promised returns. Naylor would keep a sizeable commission on the funds he received.

Naylor's testimony is cryptic, at best, on how he actually would obtain money secured by the certificate. In the late 1990's, he retained Edmond Miles of Great Britain as a "project consultant" to assist in obtaining funding for the 1,000-metric ton certificate. Miles testified at trial via video deposition that neither his efforts to obtain funding in exchange for the certificate, nor any of the other ventures on which he worked with Naylor, ever bore fruit. In addition, Miles testified that the certificate would not be vouched for by UBS, and that any

---

[3] Douglas Freedman, the bank compliance officer for the New York office of UBSAG, the successor corporation to UBS, testified that (1) UBS had no affiliation with Lincoln or the Overseas Bank, (2) the UBS logo that appeared on the 1,000-metric ton certificate was invalid, (3) UBS did not hold "anything along the lines" of 1,000 metric tons of gold, (4) UBS did not issue gold certificates, and (5) UBS had informed Naylor that at least one of his certificates "was a fraudulent document."

representations about the certificate for the purpose of inducing an investment would be improper. Miles nonetheless testified that he thought Naylor honestly believed in the bona fides of the certificate.

### 2. The 3,500-metric ton certificate

The second gold certificate was supposedly redeemable for 3,500 metric tons of gold (the "3,500-metric ton certificate"). Naylor claimed he also obtained it from the Foundation. At some point in the mid-1990's, however, Naylor apparently entrusted the original certificate to Arne Lundh, a London businessman. Naylor testified that Lundh had prior experience trading in gold certificates and was assisting in obtaining money collateralized by the certificate. Unfortunately, according to Naylor, Lundh stole the original certificate. Naylor sued him in London in the late 1990's. A London barrister named Bitu Bhalla represented Naylor in the British action and testified by video deposition at Naylor's criminal trial. A British court issued an order requiring Lundh to return the certificate.

### C. The Role of Sandee Dowlin

Sandee Dowlin served as Naylor's executive assistant. In 1993, she met Naylor at a Village Inn restaurant in Cheyenne, Wyoming, where she worked as a waitress. Their relationship started as a personal one. Thereafter, Dowlin began helping Naylor promote his investment programs. Naylor acted as the President

and Chief Financial Officer of Dos Brisas, one of his several investment vehicles, and Dowlin served as Secretary-Treasurer. While Naylor traveled, Dowlin kept track of office matters. Sometimes Dowlin accompanied Naylor to meetings with investors, where they both discussed the humanitarian building projects they intended to finance, including construction of sod houses and a daycare center in the Philippines, and a baseball diamond in Wyoming. Naylor represented falsely to investors that Dowlin had been an accountant for years at KPMG. She similarly represented to investors that she was a certified public accountant, when she was not.

Although investors never saw their investments materialize, Naylor and Dowlin obtained more than $1,000,000 by promising that huge returns were just around the corner. Naylor and Dowlin used these funds for their personal benefit, obtaining, among other things, a 1999 Lincoln Navigator, a 1999 GMC Suburban, and a house.

### D. The Investigation

Eventually, a federal investigation uncovered the defendants' scheme. In October 2000, agents from the Federal Bureau of Investigation executed a search warrant for Naylor's and Dowlin's residence, where the agents discovered and seized copies of gold certificates and other documents. The agents found what Naylor claimed was an original gold certificate worth billions of dollars in an

unlocked file cabinet. Agents also found copies of gold certificates that had been altered using what appeared to be "white-out." Multiple facsimiles both to and from the defendants disclosed that UBS had denied the validity of the 1,000-metric ton certificate.

In addition, agents seized at least seven facsimiles between the defendants and an individual named Jeff Putnam. Naylor claimed Putnam was an Evansville, Indiana bookkeeper and business associate responsible for securing at least $300,000,000 in funding. Putnam, it turns out, was wanted by local police for failure to pay small amounts of restitution at the same time Naylor was asking him to raise millions of dollars. Putnam died prior to trial.

### E. The Trial

At trial, Naylor's main defense was that he had no intent to defraud because he had a good faith belief in the legitimacy of the proposed investments. He testified that he trusted Putnam to fund the high-yield trading programs. Evidence introduced at trial, however, indicated that Putnam never obtained any loans to support the programs and had little ability to do so.

Naylor also attempted to show he had a good faith belief in the authenticity of the 1,000-metric ton and the 3,500-metric ton certificates. To this end, Naylor introduced evidence and testimony as to (1) how he obtained the certificates, (2) how the Foundation from which he received the certificates claimed to have come

into possession of them, (3) what he was to do with the certificates, and (4) how he was to be compensated.

He also introduced evidence and testimony that allegedly demonstrated the certificates' authenticity and his belief that the certificates were legitimate. Further, Naylor introduced most of a video deposition of Edmund Miles detailing their joint efforts to use the 1,000-metric ton certificate to obtain funds. With respect to the 3,500-metric ton certificate, Naylor introduced evidence from the London trial against Arne Lundh, including a video deposition of Bitu Bhalla detailing the legal proceedings, and the order from the British court requiring Lundh to return the certificate.

Dowlin's trial defense was that she, like the investors, was a hapless victim of Naylor's deception who had no knowledge that his business dealings were a hoax.

A jury found the defendants guilty on all counts. The trial court sentenced Naylor to 97 months imprisonment and ordered him to pay $484,000 in restitution. The court sentenced Dowlin to 46 months imprisonment and ordered her to pay $272,000 in restitution jointly and severally with Naylor.

## II. Sufficiency of the Evidence

Naylor and Dowlin both argue the evidence introduced at trial was insufficient to support their conspiracy convictions. They contend the

government failed to prove Dowlin knew of the fraudulent nature of Naylor's activities. Dowlin also contends that insufficient evidence existed to convict her of the fraud and aiding and abetting claims.

We review de novo claims that the evidence presented at trial was insufficient to support a conviction. *See United States v. Gabaldon*, 389 F.3d 1090, 1094 (10th Cir. 2004). "Evidence is sufficient to support a conviction if the evidence and the reasonable inferences drawn therefrom, viewed in the light most favorable to the government, would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *Id*. Our review in this context is highly deferential as "we will not overturn a jury's verdict unless no reasonable juror could have concluded, on the basis of the evidence presented, that the defendant was guilty of the crime charged." *Id.* During our de novo review, we accept the jury's credibility determinations and resolution of conflicting evidence. *See United States v. Davis*, 1 F.3d 1014, 1017 (10th Cir. 1993).

## A. Conspiracy Between Naylor and Dowlin

A conspiracy under 18 U.S.C. § 371 requires the government to prove: (1) the existence of an agreement; (2) to break the law; (3) an overt act; (4) in furtherance of the conspiracy's object; and (5) that the two willfully entered into

the conspiracy.[4] *See United States v. Hanson*, 41 F.3d 580, 582 (10th Cir. 1994).

"While all five of these elements must be present, the essence of any conspiracy is the agreement or confederation to commit a crime." *Id.* (citations and quotations omitted). Further, "[t]he nature of a conspiracy, with its attendant aspects of secrecy, often requires that elements of the crime be established by circumstantial evidence." *United States v. Nall*, 949 F.2d 301, 305 (10th Cir. 1991).

An agreement may be inferred from a "unity of purpose or common design and understanding" among conspirators to accomplish the objects of the conspiracy. *United States v. Kendall*, 766 F.2d 1426, 1431 (10th Cir. 1985). Similarly, an agreement may be inferred from the joint appearance of defendants at transactions and negotiations furthering the conspiracy, the relationship among co-defendants, and their mutual representations to third parties. *See United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992); *United States v. Grimes*, 967 F.2d

---

[4] Section 371 provides in relevant part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371.

1468, 1471–72 (10th Cir. 1992).

Both defendants argue the government introduced insufficient evidence to prove that they entered into an agreement to break the law or that Dowlin did so knowingly or willfully. Although both concede Dowlin willingly participated in Naylor's businesses, their argument is that Dowlin did not know Naylor's activities were fraudulent. Therefore, our analysis of the conspiracy focuses on whether the government introduced sufficient evidence for a rational jury to find that Dowlin knew of the illegality of Naylor's schemes and agreed to participate in them. We find there was sufficient evidence.

As an initial matter, Dowlin was not an uninformed office assistant. She substantially assisted Naylor in the day-to-day operations of the companies Naylor had set up to promote the investments. For example, she was Secretary-Treasurer of their company, Dos Brisas, and corporate documents authorized her to trade on the gold certificates. She assisted Naylor in preparing paperwork supplied to investors and others, and had access to his written correspondence and faxes, including some that demonstrated the "programs" were not likely to ever produce revenue, even if they were real. Dowlin also accessed investor money, which she was responsible for during Naylor's absences. She traveled with Naylor to London on one business trip.

In addition to her involvement with the operational side of Naylor's

businesses, Dowlin appeared at meetings with investors. Her representations at these meetings played into the charitable instincts of investors and reinforced the credibility of Naylor's statements about benefitting Philippine and Wyoming humanitarian projects. Dowlin also falsely represented to some investors that she was a certified public accountant when she was not; Naylor represented to other investors that Dowlin had worked as an accountant at KPMG. In short, the evidence supports a conclusion that Dowlin was aware of the dubious prospects of Naylor's ventures, but did not reveal to investors what she knew about the schemes at a time she was benefitting from them.

Further, Dowlin knew that the funding she and Naylor received was not being spent on investment projects, but for personal gain. For instance, following a meeting with investors on October 15, 1998, Dowlin and Naylor received a $400,000 investment in exchange for assurances of large, short-term returns. That same day, the defendants used the funds to obtain a cashier's check to purchase a 1999 Lincoln Navigator in Dowlin's name, and a short time later, bought a home. Dowlin also deposited investor money into her own bank accounts and used the money for personal or family expenses, such as providing cash to her children, paying her son's mortgage, and paying a grandchild's private school tuition.

Based on these facts, a rational jury could have found beyond a reasonable

doubt that Dowlin knew Naylor's activities were fraudulent and that she willingly participated in his schemes.  Accordingly, the evidence was sufficient to support the conspiracy convictions.

**B.  Fraud and Aiding and Abetting as to Dowlin**

Dowlin also contends that insufficient evidence existed to convict her of wire fraud and aiding and abetting, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, and securities fraud and aiding and abetting, in violation of 15 U.S.C. §§ 77q(a)(1)–(3) and 77x and 18 U.S.C. § 2.[5]  Dowlin does not deny that Naylor engaged in the activities that led to him being charged and convicted for these crimes.  Rather, as above, she argues she could not be found guilty because the government failed to prove she knowingly assisted Naylor in his fraudulent practices.

---

[5] To establish wire fraud under § 1343 the government must prove "(1) a scheme or artifice to defraud and (2) use of interstate wire communications to facilitate that scheme." *United States v. Janusz*, 135 F.3d 1319, 1323 (10th Cir. 1998).  The indictment charged Dowlin and Naylor with fraudulently inducing investors to transfer $25,000 to them via wire.

To establish securities fraud under Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, the government must prove (1) "the offer or sale of any security by the use of instruments of interstate commerce," *United States v. Austin*, 462 F.2d 724, 730 (10th Cir. 1972), and (2) fraudulent conduct in connection with that offer or sale, such as "the use of any scheme to defraud [or] the omission of material facts necessary to make statements not misleading." *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1433–34 (10th Cir. 1988).  The indictment charged Naylor and Dowlin with fraudulently charging an "application fee" of $10,000 to $15,000 in exchange for a funding expectation of $1 million.

"Under the aiding and abetting statute, once the device, scheme or artifice to defraud has emerged, the question is whether one has participated in the criminal transaction or transactions shown to have been perpetrated." *United States v. Austin*, 462 F.2d 724, 732 (10th Cir. 1972). Here, the existence of the device to defraud is not challenged. In addition, as discussed above, the government presented ample evidence at trial to support a finding of Dowlin's willing and knowing involvement in Naylor's fraudulent ventures. Consequently, we hold that the government introduced sufficient evidence to convict Dowlin.

### III.  Trial Objections and Jury Instructions

Naylor next argues that several of the district court's rulings during the course of the trial constituted reversible error. First, he asserts the court denied him the right to present a defense by excluding portions of the deposition testimony of two witnesses regarding the gold certificates. Second, he claims the court erred in refusing to continue the trial after a foreign witness became ill the last day of trial and was unable to testify. Finally, he claims the court erred in two of the instructions tendered to the jury. We reject each argument.

### A.  Exclusion of Testimony at Trial

Naylor contends the district court violated his Fifth and Sixth Amendment rights by improperly excluding portions of the videotaped testimony of two witnesses, Bitu Bhalla and Edmund Miles. Naylor argues the excluded testimony

-16-

would have bolstered his claim that he had a good faith belief in the validity of the gold certificates.

The district court has broad discretion in determining the admissibility of evidence. *See United States v. Bautista*, 145 F.3d 1140, 1151 (10th Cir. 1998). Accordingly, "[w]e review questions concerning the admission of evidence under an abuse of discretion standard" such that "[w]e will not disturb an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error in judgment." *United States v. Jenkins*, 313 F.3d 549, 559 (10th Cir. 2002). The question of whether a constitutional violation has occurred is reviewed de novo. *See United States v. Ramone*, 218 F.3d 1229, 1234 (10th Cir. 2000).

A defendant's right to due process of law under the Fifth Amendment and to compulsory process under the Sixth Amendment includes the right to present witnesses in his or her own defense. *See Washington v. Texas*, 388 U.S. 14, 18–19 (1967). "The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense . . . . This right is a fundamental element of due process of law." *Id.* at 19. "However, the right to present defense witnesses is not absolute. A defendant must abide the rules of evidence and procedure," including "standards of relevance and materiality." *Bautista*, 145 F.3d at 1151–52.

-17-

To determine whether the district court violated Naylor's right to present witness testimony, we first determine whether the district court erred in excluding the testimony. If so, we examine whether the excluded testimony was relevant and material, i.e. "whether it was of such an exculpatory nature that its exclusion affected the trial's outcome." *Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997). With this framework in mind, we discuss Naylor's objections to the partial exclusion of testimony by Bhalla and Miles.

### 1. Bitu Bhalla's testimony

Bitu Bhalla represented Naylor in his London action to recover the 3,500-metric ton certificate Arne Lundh supposedly stole. As a result of the proceedings, a British court issued an order requiring Lundh to return the certificate. Naylor introduced the court's order (but not the transcript of the proceedings) at trial. In addition, Naylor sought to introduce a videotape deposition of Bhalla discussing Bhalla's representation of Naylor in the action against Lundh.

Although the district court allowed the deposition to be shown, it excluded a portion of Bhalla's testimony regarding his recollection of the British judicial proceedings. The excluded testimony consisted of Bhalla's statements that during the London trial (1) Naylor was in the courtroom and became "quite animated" when Lundh testified he had found an expert who could authenticate the 3,500-

metric ton gold certificate and (2) Lundh testified he used the certificate to obtain a line of credit from a bank. The district court concluded this testimony was hearsay and not relevant to whether the 3,500-metric ton gold certificate was genuine.

We find the district court erred in excluding this testimony as hearsay. We agree with Naylor that he did not offer the testimony for the truthfulness of Lundh's statements, but rather for the nonhearsay purpose of showing a basis for Naylor's belief in the authenticity of the certificate. *See Hernandez v. United States*, 608 F.2d 1361, 1364 (10th Cir. 1979) (evidence properly admitted where offered to show lack of knowledge rather than truth of matter asserted). We also find the evidence was relevant because whether Naylor heard someone attest to the certificate's authenticity had some bearing on whether he had a good faith belief in its authenticity. *See Miller v. United States*, 120 F.2d 968, 970 (10th Cir. 1941) (defendant can show lack of fraudulent intent by introducing statements of third persons).

Although the testimony was not excludable on hearsay or relevancy grounds, to establish constitutional error Naylor must also show the evidence was material to the extent its exclusion violated his right to present a defense. *See Richmond*, 122 F.3d at 872. To determine materiality, we examine the record as a whole and inquire "as to whether the evidence was of such an exculpatory nature

-19-

that its exclusion affected the trial's outcome." *Id.* at 874 (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 868 (1982)). Two queries inform our analysis: first, whether the proffered testimony was "the type that if believed would have, by necessity, exculpated the defendant;" and second, whether "the proffered testimony, even if admitted, would have created a reasonable doubt that did not exist without the evidence." *Id.*

The excluded testimony does not satisfy either query. Initially, Bhalla's testimony would not have necessarily exculpated Naylor even if believed. Naylor's reaction at trial upon hearing Lundh's testimony could have been due to many things aside from a good faith belief in the 3,500-metric ton certificate's authenticity. Second, Naylor's belief regarding the validity of one of several gold certificates at issue in the trial would not by itself exculpate him from the overall scheme. The excluded testimony related to the 3,500-metric ton certificate, which itself did not figure prominently in any of the investment pitches described during trial. Rather, the testimony of investors suggests that Naylor primarily relied on the 1,000 metric ton certificate during the time period in question. In addition, even if Naylor *did* believe in the authenticity of the gold certificate, such a belief would not preclude a jury from finding that he nonetheless used fraudulent solicitations to obtain investor funds, for example by falsely indicating that the gold certificates would generate large returns in a short period of time or that

-20-

Dowlin was a CPA.

The next inquiry, then, is whether the excluded testimony would have created a reasonable doubt as to Naylor's culpability. It would not. Naylor presented extensive evidence, through Bhalla and others, of the sincerity of his efforts to recover the gold certificate from Lundh in the British court proceedings. Naylor, Bhalla, Miles, and an FBI agent all testified about the British trial. Naylor even introduced the court order. Further, the FBI agent testified Naylor informed him that during the British court proceedings a witness testified to the authenticity of the 3,500-metric ton certificate. Naylor also presented substantial evidence of his good faith belief in his investment programs through the testimony of other witnesses who confirmed that Naylor appeared to honestly believe in the authenticity of the certificates. Finally, Naylor personally testified regarding all of these events. Nonetheless, after hearing hours of testimony and viewing considerable evidence purportedly demonstrating Naylor's belief in the certificates' authenticity, the jury convicted Naylor on all counts.

In light of the substantial evidence of guilt in the record, we find the district court's exclusion of portions of Bhalla's deposition testimony did not violate Naylor's right to present a defense.[6]

---

[6] Naylor did not assert that the district court's error in excluding Bhalla's testimony, independent of its affect on his Fifth and Sixth Amendment right to

(continued...)

### 2. *Edmund Miles's testimony*

Edmund Miles met Naylor in the late 1990's when Naylor asked him to obtain a line of credit on the 1,000-metric ton certificate. At trial, Naylor sought to introduce a video deposition of Miles discussing their business dealings. The district court admitted most of the deposition but excluded two parts of Miles's testimony: first, one instance in which Miles testified that he believed the certificate was genuine; and second, one instance in which Miles stated he informed Naylor that it was UBS's policy not to authenticate gold certificates until they reached their date of maturity.

Naylor argues the court erred in excluding this evidence. However, he failed to object to the exclusion of the evidence at trial and did not advance an argument before the district court demonstrating the evidence's admissibility. Therefore, he failed to adequately preserve the claim for appeal and our review is for plain error. *See Allan v. Springville City*, 388 F.3d 1331, 1335 (10th Cir.

---

[6](...continued)
present a defense, entitles him to a new trial. *See United States v. Velarde*, 214 F.3d 1204, 1211 (10th Cir. 2000) ("A non-constitutional error, such as a decision whether to admit or exclude evidence, is considered harmless unless a substantial right of a party is affected." (quotations and alterations omitted)). Accordingly, we do not consider the question. Even if it had been raised, however, Naylor would not be entitled to relief for those same reasons set out above in resolving his constitutional claim. *See id.* ("We have defined an effort affecting a substantial right of a party as an error which had a substantial influence on the outcome or which leaves one in grave doubt as to whether it had such an effect." (quotations and alterations omitted)).

2004) ("To adequately object to the exclusion of evidence, the proponent of the excluded evidence must explain [to the district court] what he expects the evidence to show and the grounds for which he believes the evidence is admissible." (quotations and citation omitted)); *United States v. James*, 257 F.3d 1173, 1182 (10th Cir. 2001) (detailing elements of plain error review).

We find no error in the district court's ruling. Regarding Miles's excluded testimony about his belief in the authenticity of the 1,000-metric ton certificate, there is no showing he ever communicated this belief to Naylor. In fact, Miles testified in the excluded portions that this belief came into being "a long time" after he spoke with Naylor about UBS's policy regarding the authentication of gold certificates. Therefore, the testimony would not bolster Naylor's good faith defense. In addition, the portion of Miles's testimony *admitted* by the court established that both Miles and Naylor believed the certificate to be authentic. In light of the admitted testimony, we cannot conclude the court erred in excluding one more instance in which Miles stated he believed the certificate to be authentic.

With respect to Miles's testimony that he informed Naylor of UBS's policy not to authenticate gold certificates until they reached their date of maturity, the testimony is only marginally relevant to whether Naylor believed the certificate to be legitimate. Further, Naylor's 'pot of gold at the end of the rainbow' defense

was more than adequately explained through other evidence. For example, the admitted portions of Miles's testimony established that (1) he communicated to Naylor nothing could be done with the certificate until maturity unless Naylor located a private buyer, (2) no one could determine the validity of the certificates until the time of maturity, and (3) UBS had a policy not to "verify or acknowledge until maturity," which was designed to limit public information about existence of the valuable holdings. In addition, the court allowed Naylor to present direct evidence of his good faith belief in the certificates through documentary and testimonial evidence.

Based on the evidence in the record, we cannot say the excluded portion of Miles's testimony affected the outcome of the trial. Therefore we hold that exclusion of the evidence was not plain error.

### B. Denial of Continuance

Naylor next maintains the district court impeded his ability to present a defense by denying him a continuance when a listed foreign defense witness, Eugenio Macacabayao, fell ill.

Prior to trial, the parties anticipated the case would take about two weeks to try. The government rested its case on Monday, February 3, 2003. Macacabayao, however, did not arrive in Cheyenne from the Philippines until Friday, February 7, 2003, the last scheduled day of trial. Because Macacabayao did not arrive in

time to testify on Friday, the district court continued the trial until the following Monday, February 10, 2003. Unfortunately, upon arrival in Wyoming, Macacabayao experienced chest pains and was admitted to a local hospital. Although he was interviewed by defense counsel over the weekend, the illness apparently left Macacabayao in no condition to testify or even to give a deposition under oath.

Naylor moved for a continuance to allow Macacabayao time to recover sufficiently to either testify in open court or to be deposed in his hospital room. In support of the motion, counsel proffered that Macacabayao would testify he was a practicing attorney and chairman of the Foundation; Major Rolando Miranda, a board member of the Foundation, had given a gold certificate to Naylor; Miranda represented to Naylor the certificate was a valuable and authentic document; and Naylor was enlisted to use the certificate to obtain funding to assist the Foundation with its humanitarian projects.

In the district court, the government argued the testimony was largely irrelevant and cumulative because the only relevant fact it supported was whether Naylor believed the certificates were real. The government also pointed out that Naylor's counsel provided no showing as to when Macacabayao would be sufficiently recovered to testify. The court agreed and denied the continuance, noting the testimony would consist largely of inadmissible hearsay.

On appeal, Naylor argues Macacabayao's testimony was important to his defense because it corroborated Naylor's testimony regarding how he obtained the 1,000-metric ton gold certificate and why he believed it was authentic. He maintains the exclusion of this testimony was especially damaging because he testified at trial that a Filipino would corroborate his version of the events and the jury was left to speculate as to the reason for Macacabayao's non-appearance.[7]

"We review the denial of a motion for continuance of trial for abuse of discretion and 'will find error only if the district court's decision was arbitrary or unreasonable and materially prejudiced the defendant.'" *United States v. Diaz*, 189 F.3d 1239, 1247 (10th Cir. 1999) (quoting *United States v. Simpson*, 152 F.3d 1241, 1251 (10th Cir. 1998)). In determining whether a district court arbitrarily or unreasonably denied a motion for a continuence, we examine:

---

[7] Naylor testified during cross examination in this regard as follows:

Q:          Who gave you—you met somebody in the Philippines
            and they simply gave you $9 billion worth of a
            certificate?
Naylor:     Well, if we could get the story straight, I could probably
            tell you exactly what happened, but I think we're
            starting in the wrong direction here. The people I met in
            the Philippines—you're going to be seeing one of them
            here tomorrow.
Q:          And he can testify about what he knows about the gold
            certificate, is that right?
Naylor:     Oh, yes. Yes.

(1) the diligence of the party requesting the continuance; (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; [and] (4) the need asserted for the continuance and the harm that appellant might suffer as a result of the district court's denial of the continuance.

*United States v. Wynne*, 993 F.2d 760, 767 (10th Cir. 1993) (citations omitted).

Furthermore, because Naylor sought the continuance to obtain witness testimony, he was required to show who the witness was, what his testimony would be, and that the testimony would be competent and relevant. *See United States v. Harris*, 441 F.2d 1333, 1336 (10th Cir. 1971).

Applying these factors, we conclude that Naylor has not made a sufficient showing to justify relief. First, although Naylor sought the continuance as soon as it was clear Macacabayao would not be able to testify, he did not use diligence in procuring Macacabayao's presence at the trial. Even without the witness's illness, Naylor had already caused a delay of the trial because Macacabayao did not arrive in Cheyenne in time to testify on February 7.

Second, if granted, the continuance would have seriously inconvenienced the court, the prosecution and the jury. At the time of Naylor's request for a continuance, no alternate jurors existed.[8] Had the court granted a continuance, it

---

[8] One alternate was excused on grounds not disclosed in the record. The second alternate was excused due to physical ailment on the day Naylor requested

(continued...)

would have risked having to retry the entire case if any additional juror needed to be excused. Furthermore, the case had already lasted two weeks and, excluding Macacabayao's testimony, each side had presented its entire case, including out-of-state witness testimony.

On the other hand, the denial of the continuance caused only minimal harm to Naylor. He sought the testimony for two purposes. First, to corroborate his own testimony regarding how he came into possession of the 1,000-metric ton certificate. Naylor's proffer outlining Macacabayao's proposed testimony, however, did not establish whether Macacabayao was present when Naylor received the certificate. If Macacabayao learned of the transaction from a third party, his testimony would have been hearsay.

Second, Naylor offered the proposed testimony to show his good faith belief in the certificate's validity. However, as noted above, Naylor put forth extensive other evidence of his beliefs, including documents from the Foundation that attest to the bona fides of the certificates. In addition, as above, the proffer does not establish that Macacabayao was present when the Foundation made the alleged representations to Naylor regarding the certificate. Without such evidentiary groundwork, the district court properly excluded the proposed

---

[8](...continued)
a continuance.

testimony as hearsay.

In any event, having reviewed the record in its entirety we conclude that Macacabayao's testimony would have done little to exculpate Naylor because it was mainly cumulative and, even if believed, would not have precluded the jury from finding him guilty. Thus, the district court's decision not to grant the continuance did not "materially prejudice" Naylor in the presentation of his good faith defense. *See United States v. McKneely*, 69 F.3d 1067, 1077 (10th Cir. 1995); *see also United States v. Rodriguez*, 15 F.3d 408, 411 (5th Cir. 1994) (holding that when a continuance is sought because a witness is unavailable, the movant must show, among other things, that the witness would provide substantial favorable evidence).

Finally, the district court specifically instructed the jury not to speculate as to the reason for Macacabayao's absence, thereby alleviating any prejudice caused by his failure to appear at trial. For these reasons, we hold that the district court did not err in denying a continuance.

## C. Jury Instructions

Naylor contends the court tendered two erroneous instructions to the jury regarding the government's burden of proof and the elements of fraud under the 1935 Securities Act.

### 1. Instruction 12—Burden of Proof

Naylor argues the district court's reasonable doubt instruction misled the jury into believing it could convict him by only a preponderance of the evidence. Typically, "[t]he appropriate standard of review for challenges to jury instructions is whether the jury, considering the instructions as a whole, was misled." *United States v. Smith*, 13 F.3d 1421, 1424 (10th Cir. 1994). Similarly, the constitutional question implicated by concerns over the adequacy of jury instructions is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Victor v. Nebraska*, 511 U.S. 1, 6 (1994) (referring to *In re Winship*, 397 U.S. 358, 364 (1970), which held that the government must prove beyond a reasonable doubt every element of a charged offense). Here, however, Naylor did not object to the instruction at trial. Therefore, our review is for plain error. *See United States v. Hernandez-Garcia*, 901 F.2d 875, 876 (10th Cir. 1990).

On appeal, Naylor raises three specific objections to Instruction 12, which read in part:

> If you, as jurors view the evidence in the case as reasonably permitting either of two conclusions -- one of innocence, the other of guilt -- you should of course adopt the conclusion of innocence.[9]

---

[9] The entirety of Instruction 12 read as follows:

The law presumes a defendant to be innocent of a crime. Thus a defendant, although accused, begins the trial with a "clean slate" with

(continued...)

(...continued)
no evidence against him or her. And the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused. The presumption of innocence, alone, is sufficient to acquit a defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

As I have said many times, the United States has the burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely true than not. In criminal cases, the United States' proof must be more powerful than that. It must be beyond a reasonable doubt.

There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. A reasonable doubt is the kind of doubt arising, after consideration of all the evidence, that would cause reasonable people to hesitate to act upon it when conducting the more serious and important affairs in their own lives. A defendant is not to be convicted on mere suspicion or conjecture.

The burden of proof is always upon the prosecution to prove that the defendant is guilty beyond a reasonable doubt. The burden never shifts to a defendant. A defendant has the right to require the United States to prove its case against him or her, and if he or she is satisfied that the United States has not proved its case, may decline to call any witnesses or produce any evidence.

Therefore, after careful and impartial consideration of all the evidence in the case, you as jurors retain a reasonable doubt that a defendant is guilty of the charge you must acquit. If you, as jurors view the evidence in the case as reasonably permitting either of two conclusions -- one of innocence, the other of guilt -- you should of course adopt the conclusion of innocence.

(continued...)

The first objection is that the instruction used the term "should" instead of the term "must." Naylor's second objection is that the instruction improperly interchanged the terms "innocence" and "not guilty." Finally, Naylor claims the instruction unlawfully diluted the burden of proof by suggesting there is a standard below "beyond a reasonable doubt" on which the jury could convict. Although we disapprove of a portion of the tendered instruction, viewing the instruction in its entirety we hold that it did not compromise Naylor's right to a fair trial.

### a. Use of the term "should"

Naylor first argues that the instruction improperly used the non-mandatory term "should" in instructing the jury to return a not guilty verdict if the evidence reasonably permitted a finding of innocence. The penultimate sentence of the instruction, however, stated, "[If] after careful and impartial consideration of all the evidence in the case, you as jurors retain a reasonable doubt that a defendant is guilty of the charge, you must acquit." In light of this language, as a whole, the instruction made clear that the jury was only allowed to convict if it found Naylor guilty beyond a reasonable doubt. We thus discern no error.

### b. Not guilty and innocent

---

[9](...continued)

Naylor next argues that the instruction was also misleading because it used the terms "not guilty" and "innocent" interchangeably. He relies on a First Circuit case concluding that interchanging the terms could confuse a jury and "risks undercutting the government's burden by suggesting that they should find the defendant guilty if they think he is not innocent--regardless of how convincing the government's proof has been." *United States v. Mendoza-Acevedo*, 950 F.2d 1, 4 (1st Cir. 1991).

We disagree with this assessment. Although the instruction used mixed terminology, in light of the instruction as a whole we do not see how the jury was misled concerning its obligation to apply the presumption of innocence. As a practical matter, in the context of this jury instruction "not guilty" and "innocence" are equivalent. Taking a step back, on this record the instruction's overall structure and language are not misleading. The two terms—"not guilty" and "innocent"—were not likely to confuse the jury in applying the proper burden of proof.

### c. Two-inference language

Naylor's third argument has merit. He contends that by allowing two inferences, guilt and innocence, where the evidence does not decisively favor one outcome, the instruction improperly diluted the government's burden of proof by suggesting there is a quantum of proof sufficient to convict above "innocent" but

below "beyond a reasonable doubt."

The Second Circuit has long disapproved of the instruction:

The "two-inference" language, that if the jury believes the evidence permits either the inference of innocence or of guilt, the jury should adopt the former, is obviously correct as far as it goes. *But such an instruction by implication suggests that a preponderance of the evidence standard is relevant, when it is not. . . . It instructs the jury on how to decide when the evidence of guilt or innocence is evenly balanced, but says nothing on how to decide when the inference of guilt is stronger than the inference of innocence but no[t] strong enough to be beyond a reasonable doubt. . . .* Therefore, . . . the "two-inference" language should not be used because, standing alone, such language may mislead a jury into thinking that the government's burden is somehow less than proof beyond a reasonable doubt.

*United States v. Khan*, 821 F.2d 90, 93 (2d Cir. 1987) (emphasis added); *see also United States v. Jacobs*, 44 F.3d 1219, 1226 (3d Cir. 1995) (disapproving use of two-inference language).

Our circuit has yet to address the narrow question as to the propriety of using this two-inference language. We agree with the Second and Third Circuits that, standing alone, the language is imprecise and should not be used. The mischief from the instruction comes from the risk that a jury may focus on narrow portions of the instruction and not its overall thrust. In light of this risk, we agree that the instruction should be modified to delete the two-inference language.

The saving grace for the instruction is that overall it adequately directed the

-34-

jury to the applicable burden of proof. Applying the plain error standard, there is little doubt the jury properly understood its constitutional duty. The instructions as a whole told the jury not to convict Naylor unless the government proved his guilt beyond a reasonable doubt. For example, Instruction 12 explained to the jury that the government had the burden of proving guilt beyond a reasonable doubt, specifically defined "reasonable doubt," and distinguished reasonable doubt from a preponderance of the evidence. Considered in context, we cannot conclude the jury was misled by the instruction. *See Victor*, 511 U.S. at 6.

Accordingly, the district court did not plainly err when it issued this instruction.

### 2. Instruction 51—Elements of Fraud

Naylor's last argument is that the district court inappropriately instructed the jury it could find securities fraud under 15 U.S.C. § 77q without finding Naylor had an intent to defraud. Naylor objected to this instruction at trial. Therefore we review the instructions de novo "to determine whether, as a whole, the instructions correctly state the governing law and provide the jury with an ample understanding of the issues and applicable standards." *United States v. Cecil*, 96 F.3d 1344, 1347 (10th Cir. 1996).

The portion of Instruction 51 to which Naylor objected provided:

A statement which is untrue or a representation which is false rises to the level of "fraud" when the person making it knew the statement to

-35-

be untrue or knew the representations to be false at the time that the statement or representation was made.

Naylor asserts this instruction allowed a jury to make a finding of fraud based solely on whether he knowingly made an untrue statement or representation, without requiring the jury to also find that he had an actual intent to defraud.

Once again, Naylor's argument fails because it improperly isolates one part of the jury instruction, rather than taking into account the instructions as a whole. Instruction 51 consisted of seven full paragraphs describing the meaning of "fraud," "fraudulent," and "defrauding." Other parts of the instruction explained:

– If "the evidence has established beyond a reasonable doubt that the defendants . . . acted with a fraudulent intent . . . it is unimportant whether the defendants were successful and accomplished the plan;"

– "[E]ven though some individual may have lost money in the transactions . . . , this does not rise to the level of fraud unless the evidence establishes beyond a reasonable doubt that the transaction was designed and intended by the defendant to deceive, or trick, or injure, or damage;" and

– "An honest belief or 'good faith' belief by the defendants that the statements or representations made were true is a complete and total defense to the charge of securities fraud."

Viewed as a whole, the instruction required the jury to find intent to defraud before it could convict Naylor. Consequently, Naylor's contention is without merit and the district court did not err.

## IV. Dowlin's Sentence

The base level offense provided in the United States Sentencing Guidelines

-36-

("Guidelines" or "USSG") for Dowlin's fraud convictions was 6. *See* USSG § 2B1.1(a) (2002). The district court enhanced Dowlin's sentence by 14 points after determining the loss in the case exceeded $400,000, *see id.* § 2B1.1(b)(1)(H), and by another 2 points after finding there were more than 10 but less than 50 victims, *see id.* § 2B1.1(b)(2)(A). On the basis of these enhancements, the court increased the offense level from 6 to 22. Dowlin's criminal history category of II and her offense level of 22 provided for a sentencing range of 46-57 months. The court sentenced Dowlin to the bottom end of the range, 46 months. Without any judge-found facts, Dowlin would have had an offense level of 6, which provides for a sentence of 1-7 months when combined with her criminal history.

After oral argument, Dowlin moved to file a supplemental brief arguing her sentence was invalid under *Blakely v. Washington*, 124 S. Ct. 2531 (2004). Following the Supreme Court's ruling in *United States v. Booker*, 125 S. Ct. 738 (2005), we granted the motion. Dowlin asks this court to remand her case for resentencing because the district court determined her sentence using impermissible judicial factfinding and treated the Guidelines as mandatory in violation of *Booker*. Dowlin first argues *Booker* error constitutes structural error warranting a remand without a showing of prejudice. In the alternative, she claims that if the plain error standard of review applies, that standard is satisfied.

**A. Constitutional *Booker* error is not structural error**

At the outset, we reject Dowlin's argument that *Booker* error is structural error. Though we have recently held non-constitutional *Booker* error is not structural error, *see United States v. Gonzalez-Huerta*, 403 F.3d 727, 734 (10th Cir. 2005) (en banc), we have yet to determine whether constitutional *Booker* error such as occurred here, *see infra* Part IV.B.1, is structural error. *See, e.g.*, *United States v. Clifton*, No. 04-2046, — F.3d —, 2005 WL 941581, *8 (10th Cir. Apr. 25, 2005) (not addressing structural error question because constitutional *Booker* error warranted remand under plain error analysis); *United States v. Lawrence*, No. 02-1259, — F.3d —, 2005 WL 906582 (10th Cir. Apr. 20, 2005) (issue not addressed); *United States v. Dazey*, 403 F.3d 1147 (10th Cir. 2005) (same).

As we stated in concluding that non-constitutional *Booker* error is not structural error: (1) "generally speaking structural errors must, at a minimum, be constitutional errors;" (2) where the defendant had counsel and an impartial judge, such as here, "there is a strong presumption against finding structural error;" and (3) "a defining feature of structural error is that the resulting unfairness or prejudice is necessarily unquantifiable and indeterminate, such that any inquiry into its effect on the outcome of the case would be purely speculative." *Gonzalez-Huerta*, 403 F.3d at 734 (internal quotations and citations

omitted). Regarding the third of these considerations, we further elaborated that "if, as a categorical matter, a court is capable of finding that the error caused prejudice upon reviewing the record, then that class of errors is not structural." *Id.*

Taking these considerations into account, the error in question here is constitutional and therefore must be more carefully scrutinized for structural concerns. However, here as in the non-constitutional *Booker* error context, a "defining feature of structural error" is lacking. Specifically, our post-*Booker* jurisprudence clearly indicates we have been able to determine whether constitutional *Booker* error prejudiced defendants based on the record of the district court proceedings. *Compare Clifton*, 2005 WL 941581, \*7–\*8 (applying plain error review and remanding for resentencing based on constitutional *Booker* error), *and Dazey*, 403 F.3d at 1173–79 (same), *with Lawrence*, 2005 WL 906582 (applying plain error review and affirming sentence). Accordingly, we hold that constitutional *Booker* error is not structural error because any prejudice stemming from such error can be evaluated on the record developed in the prior proceedings. In doing so we join the First Circuit, which has already reached a similar conclusion. *See United States v. Antonakopoulos*, 399 F.3d 68, 80 n.11 (1st Cir. 2005).

**B. Plain error analysis**

Having concluded *Booker* error is not structural error, we review the district court's sentencing decision for plain error because Dowlin did not contest the constitutionality of the Guidelines before the district court. *See Clifton*, 2005 WL 941581, at \*7.

To establish plain error, Dowlin must demonstrate the district court (a) committed error, (b) the error was plain, and (c) the plain error affected her substantial rights. *See United States v. Cotton*, 535 U.S. 625, 631 (2002); *Clifton*, 2005 WL 941581, at \*5–\*6. If all these conditions are met, a court reviewing the error may exercise discretion to correct it if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See Cotton*, 535 U.S. at 631–32. We conduct this analysis "less rigidly when reviewing a potential constitutional error." *Dazey*, 403 F.3d at 1174 (quoting *United States v. James*, 257 F.3d 1173, 1182 (10th Cir. 2001)). Applying this framework, we hold that Dowlin is not entitled to resentencing.

### 1. Was there Error?

The Supreme Court in *Booker* extended the Sixth Amendment rule articulated in *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000), and *Blakely*, 124 S. Ct. at 2537, to the federal Guidelines. *See Booker*, 125 S. Ct. at 756 ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury

-40-

verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."). To remedy the constitutional infirmity created by applying judge-found facts to the Guidelines, the Court severed the provision of the federal sentencing statute that made application of the Guidelines mandatory. *Id*. at 756–57. In Dowlin's case, the district court committed both constitutional and non-constitutional *Booker* error because it enhanced her sentence based on facts found by the court by a preponderance of the evidence and treated the Guidelines as mandatory. As we noted in *Clifton*, cases "involving constitutional *Booker* error will always involve non-constitutional *Booker* error as well" and the non-constitutional error may compound the constitutional error. 2005 WL 941581, at *5.

### 2. Was the Error Plain?

To be plain, an error must be "clear or obvious" under "current, well-settled law." *United States v. Whitney*, 229 F.3d 1296, 1308–09 (10th Cir. 2000). If the Supreme Court or this court has addressed the issue, then an error is contrary to well-settled law. *See United States v. Ruiz-Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003). Here, the district court enhanced the sentence based on judge-found facts and treated the Guidelines as mandatory, each of which is contrary to *Booker*. *See* 125 S. Ct. at 756–57. Therefore, the court plainly erred in sentencing Dowlin.

### 3. Did the Error Affect Substantial Rights?

For an error to have affected substantial rights, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993). The burden to establish prejudice to substantial rights is on the party that failed to raise the *Booker* issue below. *See Clifton*, 2005 WL 941581, at *6.

A defendant can show *Booker* error affected substantial rights by demonstrating "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Id.* (quoting *Gonzalez-Huerta*, 2005 WL 807008, at *3); *see also Dazey*, 403 F.3d at 1175–76. We have held there are at least two ways by which a defendant can establish the sentencing result would have been different but for the *Booker* error. "First, non-constitutional *or* constitutional *Booker* error may affect substantial rights if the defendant shows 'a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a), the district court judge would reasonably impose a sentence outside the Guidelines range.'" *Clifton*, 2005 WL 941581, at *6 (quoting *Dazey*, 470 F.3d at 1175). This showing can be made where there is "a disconnect between the § 3553(a) factors and [the] sentence" or the district court "expressed dissatisfaction with the mandatory Guidelines sentence" in the case. *Id.* "Second, constitutional *Booker* error may

-42-

affect substantial rights 'if the defendant shows a reasonable probability that a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence.'" *Id.* (quoting *Dazey*, 470 F.3d at 1175).

On this record, there is considerable doubt whether Dowlin can satisfy her burden under the third prong of plain error review. To begin, Dowlin has failed to establish a reasonable probability that a jury applying a reasonable doubt standard would not have reached the same conclusions as the district court in determining loss amount and the number of victims. As we described above, the district court enhanced Dowlin's sentence based on a finding of loss in excess of $400,000. Witnesses at trial testified to investing well in excess of this amount in Naylor's schemes after Dowlin became involved. With respect to the district court's determination that the offenses of conviction involved more than 10 but less than 50 victims, more than 10 witnesses testified at trial to personally investing funds in the schemes subsequent to when Dowlin became involved. Dowlin offers no argument that the jury would not have reached the same conclusions as the district court regarding this evidence, nor did she object when the court made these factual determinations.[10] Accordingly, we find it highly

---

[10] Dowlin did object to the loss amount of $1,007,715 originally contained in the presentence report. She argued that, although the sentencing "computation
(continued...)

unlikely that the factual findings of the district court affected Dowlin's substantial rights.

Further, our review of the record does not indicate a reasonable probability the district court would impose a sentence outside the Guidelines range applying the factors in § 3553(a). Nothing in the record indicates the court would have sentenced Dowlin differently had the Guidelines not been mandatory, nor has she pointed to any mitigating evidence that she failed to enter into the record because of a misapprehension that the Guidelines were mandatory.

The record, in fact, shows the following. First, the court at sentencing received argument as to Dowlin's mental health history and letters of support from friends and family. Dowlin was thus not limited by the mandatory nature of the Guidelines in presenting mitigating evidence to the district court. Second, the court found Dowlin's relatively minor role in the criminal conspiracy merited sentencing at the very low end of the Guideline range, 46 months. Third,

---

[10](...continued)
fairly recognizes the appropriate time period and appears otherwise to be a conservative accounting," a reduction of $8,000 would decrease her sentence by two offense levels. The probation officer subsequently revised the PSR to recommend a loss amount of less than $1,000,000, which the district court adopted. Dowlin did not object to the revised loss figure. Rather, at sentencing the court queried Dowlin and her attorney, asking "[i]s there anything else that you can think of that needs to be resolved" other than whether one of the investors in the schemes should be classified as a "vulnerable victim." *See* USSG § 3A1.1(b). Both Dowlin and her attorney answered no.

although the court acknowledged its reduced discretion under the Guidelines, it said nothing to suggest that Dowlin's conduct merited a sentence below the prescribed range. Finally, the facts of her case do not show the sentence is outside the heartland of sentences for similar conduct.

Though these facts cast significant doubt on whether Dowlin could show a "reasonable probability" that her sentence would have been different under a discretionary sentencing regime, we need not resolve this question since her sentence does not meet the fourth element necessary to notice plain error.

### 4. *Did the Error Affect the Proceeding's Integrity, Fairness or Public Reputation?*

We have discretion to correct an error that satisfies the first three prongs of the plain error test if that error also affects the integrity, fairness, or public reputation of judicial proceedings. *See United States v. Cotton*, 535 U.S. 625, 631–32 (2002). Where only non-constitutional *Booker* error is at issue, this standard is especially demanding. We will not notice non-constitutional *Booker* error unless the defendant establishes the error is "particularly egregious" and that our failure to correct it would result in a "miscarriage of justice."[11] *Gonzalez-*

---

[11] As we explained in *United States v. Trujillo-Terrazas*, No. 04-2075, – F.3d –, 2005 WL 880896, *4 n.1 (10th Cir. Apr. 13, 2005) (citing *Olano*, 507 U.S. at 736) the term "miscarriage of justice" has a different meaning in the plain error context than in the collateral review context. In the plain error context, a defendant can meet this burden without demonstrating actual innocence. *See id.*

*Huerta*, 403 F.3d at 736.  However, in cases containing constitutional *Booker* error, we conduct the analysis "less rigidly," meaning "we do not require the exceptional showing required to remand a case of non-constitutional error." *Dazey*, 403 F.3d at 1178.

Evidence that would tend to support an exercise of our discretion under this standard might include, for example:  (a) a sentence increased substantially based on a *Booker* error, *see Clifton*, 2005 WL 941581, at \*6; (b) a showing that the district court would likely impose a significantly lighter sentence on remand, *see id.* at \*8; (c) a substantial lack of evidence to support the entire sentence the Guidelines required the district court to impose, *see id.* at \*6–\*7; (d) a showing that objective consideration of the § 3553(a) factors warrants a departure from the sentence suggested by the Guidelines, *see United States v. Trujillo-Terrazas*, No. 04-2075, — F.3d —, 2005 WL 880896, \*5 (10th Cir. Apr. 13, 2005); or (e) other evidence peculiar to the defendant that demonstrates a complete breakdown in the sentencing process, *see Clifton*, 2005 WL 941581, at \*8.

To the contrary, a generalized assertion of error anchored solely to a Sixth Amendment violation or mandatory application of the Guidelines does not meet this standard.  Furthermore, we are less likely to exercise our discretion to notice constitutional *Booker* error where the defendant failed to contest the judge-found facts on which the sentence was enhanced before the district court.  *Cf. Dazey*,

403 F.3d at 1178 (emphasizing that defendant vigorously contested judge-found facts in deciding to remand).

Turning to this case, we hold that even if Dowlin could establish her substantial rights were affected by the sentencing error, she has failed to meet her burden under the fourth prong of our plain error analysis. Although our review is less rigid because constitutional *Booker* error occurred, and the *Booker* error increased Dowlin's sentence range, Dowlin has pointed to nothing in the record that casts doubt on the fairness of her sentence. As discussed above, Dowlin did not object to the facts on which her sentence was enhanced, the record contains ample evidence supporting the sentence imposed, and she has not identified mitigating evidence the district court did not consider at sentencing which might justify a lower sentence. Further, the statement of the court recognizing its limited discretion under the mandatory Guidelines does not indicate an inclination to impose a lighter sentence if the case were remanded. Finally, there is nothing peculiar about the facts of Dowlin's case to show a breakdown in the sentencing process. The facts of the case establish that Dowlin's conduct warranted the sentence imposed.

In sum, Dowlin's sentence is not plainly erroneous and should not be remanded for resentencing.

## V. Conclusion

We hold the government presented sufficient evidence at trial to support Naylor's and Dowlin's convictions. The two errors we identified regarding the exclusion of evidence and the jury instructions did not compromise Naylor's right to a fair trial. In addition, Dowlin's sentence is not plainly erroneous.

Case No. 03-8038 is AFFIRMED, and Case No. 03-8055 is AFFIRMED.